UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV 13           3448

CHEN, J.

| | |
|---|---|
| HAMID HASSAN RAZA; MASJID AL-ANSAR; ASAD DANDIA; MUSLIMS GIVING BACK; MASJID AT-TAQWA; MOHAMMAD ELSHINAWY, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NEW YORK; MICHAEL R. BLOOMBERG, in his official capacity as Mayor of the City of New York; RAYMOND W. KELLY, in his official capacity as Police Commissioner for the City of New York; DAVID COHEN, in his official capacity as Deputy Commissioner of Intelligence for the City of New York, <br><br> Defendants. | **ECF CASE** SCANLON, M.J. <br><br> **COMPLAINT** <br><br><br> Case No. _____ <br><br> Hon. _____ |

**INTRODUCTION**

1.      Since 2002, the New York City Police Department ("NYPD") has engaged in an unlawful policy and practice of religious profiling and suspicionless surveillance of Muslim New Yorkers. This policy and practice has a false and unconstitutional premise: that Muslim religious belief and practices are a basis for law enforcement scrutiny.

2.      As documented extensively in the NYPD's own records, its Intelligence Division has singled out Muslim religious and community leaders, mosques, organizations, businesses, and individuals for pervasive surveillance that is not visited upon the public at large or upon institutions or individuals belonging to any other religious faith. That surveillance has included the mapping of Muslim communities and their religious, educational, and social institutions and businesses in New York City (and beyond); deploying NYPD officers and informants to infiltrate mosques and monitor the conversations of congregants and religious leaders without any suspicion of wrongdoing; and conducting other forms of suspicionless surveillance of Muslim individuals, organizations, and institutions, including through the use of informants and monitoring of websites, blogs, and other online forums. Information collected from these

activities has been entered into intelligence databases. According to the commanding officer of the NYPD's Intelligence Division, its mapping activities have not generated a single lead, nor led to a single terrorism investigation.

3.      The unlawful policy and practice that these activities reflect are referred to here as the NYPD's "Muslim Surveillance Program." Through the Muslim Surveillance Program, the NYPD has imposed an unwarranted badge of suspicion and stigma on law-abiding Muslim New Yorkers, including Plaintiffs in this action.

4.      Plaintiffs are Muslim New Yorkers—religious and community leaders, mosques, and a charitable organization—caught in the dragnet of the NYPD's sweeping Muslim Surveillance Program. Among other violations, Plaintiffs have been variously subjected to unlawful surveillance by NYPD informants, videocameras, and plainclothes officers, all based on their religion and without any evidence of wrongdoing.

5.      As a result of unlawful NYPD spying, each of the Plaintiffs' religious goals, missions, and practices have been profoundly harmed. For example, Plaintiffs who are religious leaders and mosques have curtailed the religious and personal guidance that they provide to congregants for fear that this guidance might be misconstrued by NYPD officers or informants, resulting in additional unjustified scrutiny, or worse. Religious leaders and mosques have also had to record sermons for fear that NYPD officers or informants will take their statements out of context, or accuse them of saying things that they did not say. Plaintiff religious leaders' ministry, expression, and study have been significantly chilled. Knowledge and justifiable fear of NYPD surveillance have diminished congregants' attendance at the Plaintiff mosques, prompted distrust of newcomers out of concern that they are NYPD informants, and prevented the mosques from fulfilling their mission of serving as religious sanctuaries. Knowledge and justifiable fear of NYPD surveillance have also diminished the ability of a Plaintiff charity and one of its leaders to raise funds, and interfered with their mission of promoting and providing charity to needy New Yorkers in fulfillment of one of Islam's primary tenets.

6.      Through this action, Plaintiffs seek a declaration that the NYPD's policy and practice of subjecting them to suspicionless surveillance because of their Muslim faith violates their fundamental rights to equal protection and free exercise of religion under the U.S. Constitution and the Constitution of the State of New York, and the guarantee of government neutrality toward all religions under the U.S. Constitution. Plaintiffs also seek an injunction

2

against the continuation of the NYPD's unconstitutional policy and practice, and an order requiring the NYPD to destroy the information about them that it has secretly collected in violation of their constitutional rights.

## JURISDICTION & VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because this lawsuit alleges violations of the U.S. Constitution and raises questions of federal law.  Jurisdiction is also based upon 28 U.S.C. § 1343 because the lawsuit seeks relief for the deprivation of Plaintiffs' constitutional rights under color of state law.

8.      This Court has the authority to grant declaratory and injunctive relief, and any other appropriate relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.  A substantial, actual, and continuing controversy exists between the parties with respect to the Plaintiffs' claims for declaratory and injunctive relief.

9.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

10.     Plaintiff Hamid Hassan Raza is a U.S. citizen who is a resident of Brooklyn, New York, with his wife and child.  He serves as imam at Masjid Al-Ansar, where his duties include leading daily prayer services, conducting religious educational classes for the mosque community and especially its youth, and providing spiritual and personal counseling to congregants.  Since at least 2008, Imam Raza has been subject to NYPD surveillance.

11.     Plaintiff Masjid Al-Ansar is a Muslim house of worship founded in 2008 and located at 2230 Bath Avenue in Brooklyn, New York.  It is registered as a 501(c)(3) organization under the name Al-Ansar Center, Inc.  In addition to holding daily prayer services, Masjid Al-Ansar provides religious education and counseling to its congregants and seeks to foster an inclusive religious community, especially for youth.  Since at least 2008, Masjid Al-Ansar has been subject to NYPD surveillance.

12.     Plaintiff Asad ("Ace") Dandia is a twenty-year-old U.S. citizen who is a resident of Brooklyn, New York.  He is a sophomore at a City University of New York community college, studying liberal arts.  He aims to become a social worker.  Plaintiff Dandia is a practicing Muslim.  He is a co-founder and Vice President of Muslims Giving Back, a charitable

3

organization.   Since at least March 2012, Plaintiff Dandia has been subject to NYPD surveillance.

13.     Plaintiff Muslims Giving Back is a New York organization that promotes and engages in charitable activities in furtherance of Islam's central tenet of charity and assistance to the needy.  It also conducts outreach and awareness raising about Islam.  Muslims Giving Back collects donations from its members and community members, which it uses to provide food and other assistance to low-income individuals in New York City.  Muslims Giving Back was formerly known as Fesabeelillah Services of NYC, Inc. ("FSNYC"), which is registered as a 501(c)(3) organization.  Since at least March 2012, Muslims Giving Back has been subject to NYPD surveillance.

14.     Plaintiff Masjid At-Taqwa is a Muslim house of worship founded in 1981 and located at 1266 Bedford Avenue in Brooklyn, New York.  It is incorporated under the name Masjid At-Taqwa, Inc.  In addition to holding daily prayer services, Masjid At-Taqwa provides religious education and counseling to its congregants and seeks to foster an inclusive religious community.  Since at least 2004, Masjid At-Taqwa has been subject to NYPD surveillance.

15.     Plaintiff Mohammad Elshinawy is a U.S. citizen who is a resident of Brooklyn, New York, with his wife and two children.  Mr. Elshinawy is a practicing Muslim.  For approximately eleven years, he has taught and lectured about Islam, giving sermons and teaching classes at various Muslim institutions in New York City.  Since at least 2004, Mr. Elshinawy has been subject to NYPD surveillance.

16.     Defendant City of New York ("the City") is a municipal corporation duly incorporated and existing under the laws of the State of New York.  The City of New York has established and maintains the NYPD as a constituent department of the City.  At all relevant times, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel.  In addition, at all relevant times, the City was responsible for ensuring that NYPD personnel obey the laws of the United States and New York State.

17.     Defendant Michael R. Bloomberg is the Mayor of the City of New York, with supervisory authority over the NYPD.  He is sued here in his official capacity.

4

18.     Defendant Raymond W. Kelly is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all members of the NYPD Intelligence Division. He is sued here in his official capacity.

19.     Defendant David Cohen is the Deputy Commissioner of Intelligence for the City of New York, with supervisory authority over the NYPD's Intelligence Division. In that role, Defendant Cohen oversees the gathering, analysis, and distribution of intelligence, and is responsible for training, recruiting, and managing all members of the NYPD Intelligence Division. He is sued here in his official capacity.

## FACTUAL ALLEGATIONS

### A.     The NYPD's Muslim Surveillance Program

20.     Since at least 2002, the NYPD has conducted its Muslim Surveillance Program through its Intelligence Division, which currently includes, or previously included: (1) the Demographics Unit (which was renamed the Zone Assessment Unit in 2010); (2) the Intelligence Analysis Unit; (3) the Cyber Intelligence Unit; and (4) the Terrorist Interdiction Unit.

21.     The NYPD developed its Muslim Surveillance Program under the leadership of David Cohen, a retired thirty-five-year veteran of the Central Intelligence Agency, who became the NYPD's Deputy Commissioner for Intelligence in 2002.

22.     The analytic underpinnings of the Muslim Surveillance Program are reflected in a 2007 report titled "Radicalization in the West: The Homegrown Threat," written by two senior analysts in the NYPD Intelligence Division, and published by the NYPD (the "NYPD Radicalization Report"). The NYPD Radicalization Report claims to identify a linear, four-stage "radicalization process" by which individuals transform into terrorists. The process laid out in the NYPD Radicalization Report draws a broad profile and treats with suspicion those who identify as Muslim, harbor Islamic beliefs, and/or engage in Islamic practices.

23.     According to the NYPD Radicalization Report, "[e]nclaves of ethnic populations that are largely Muslim often serve as 'ideological sanctuaries' for the seeds of radical thought." Within these "Muslim enclaves," the report claims that potential terrorists could range from members of middle-class families to "successful college students, the unemployed, the second and third generation, new immigrants, petty criminals, and prison parolees." It identifies as so-called "radicalization incubators" places frequented by Muslims, including mosques, "cafes, cab

5

driver hangouts, flophouses, . . . student associations, nongovernmental organizations, hookah (water pipe) bars, butcher shops and book stores." It also purports to identify as radicalization "indicators" First Amendment-protected activities in which many, if not most, religious Muslims participate—including "wearing traditional Islamic clothing [and] growing a beard," abstaining from alcohol, and "becoming involved in social activism and community issues."

24.     The NYPD Radicalization Report stigmatizes an entire faith community and invites discrimination. It specifically singles out Muslims for profiling and suspicionless surveillance because of their religious beliefs and practices. Although the NYPD claimed in 2009 that its Radicalization Report "was not intended to be policy prescriptive," upon information and belief, the NYPD Intelligence Division continues to conduct suspicionless surveillance of Muslim New Yorkers in accordance with the framework set out in the report.

25.     The NYPD's own documents show that, beginning in at least 2003, the Intelligence Division carried out the Muslim Surveillance Program by identifying, locating, and mapping Muslim New Yorkers based on a list of "ancestries of interest." The NYPD used U.S. census data and information from I-9 immigration forms and government databases to locate significant Muslim populations within New York communities associated with these "ancestries of interest."

26.     The "ancestries of interest" include "American Black Muslims" and twenty-eight countries or regions that represent eighty percent of the global Muslim population: Afghanistan, Albania, Algeria, Bahrain, Bangladesh, Chechnya, Egypt, Guyana, India, Indonesia, Iran, Iraq, Jordan, Lebanon, Libya, Morocco, Pakistan, Palestine, Saudi Arabia, Somalia, Sudan, Syria, Tunisia, Turkey, the United Arab Emirates, Uzbekistan, Yemen, and Yugoslavia. All but three of these countries or regions have majority Muslim populations. One of those remaining three countries—India—is home to eleven percent of the world's Muslim population.

27.     The NYPD's mapping efforts specifically excluded non-Muslims from law enforcement scrutiny. For example, the Intelligence Division's Demographics Unit mapped Iranian community institutions in one NYPD document, but specifically noted when those persons and institutions were Jewish or Christian—not Muslim—and therefore not of interest to the NYPD. In a report mapping the Egyptian community in 2007, the NYPD noted that Coptic Christian Egyptians were "the majority of the Egyptian community in New York City. This report does not represent the Coptic Egyptian community and is merely an insight into the

6

Muslim Egyptian community of New York City." Similarly, in its 2007 map of the Syrian community in New York City, the NYPD stated that the community is "divided into two parts, a Jewish Syrian and a Muslim Syrian community with the Jewish community being the larger of the two. This report will focus on the smaller Muslim community." Although the NYPD acknowledged the religious diversity in New York's Albanian population, police officials only mapped and photographed Albanian mosques for the NYPD's Demographics Report on Albanians.

28.    The NYPD further identified at least 263 so-called "hot spots"—such as cafés, bookstores, and restaurants—owned or frequented by Muslims.

29.    The NYPD dispatched teams of plainclothes officers known as "rakers" into neighborhoods with concentrated communities associated with Muslim "ancestries of interest" to monitor daily life in those communities. In addition, the NYPD has engaged informants to conduct suspicionless surveillance of Muslims. So-called "seeded" informants work or reside in certain ethnic neighborhoods and report to the police on neighborhood happenings. "Directed" informants gather information from locations that rakers have identified as "hot spots," notwithstanding the absence of any indication of criminal activity.

30.    Although the NYPD's dragnet Muslim Surveillance Program has swept up Muslims as a faith community, specific Muslim individuals, organizations and groups have been further singled out by the NYPD because of real or perceived stronger devotion to their faith or to particular Islamic beliefs. For example, the NYPD sent officers and informants to spy on "hot spots" that were particularly identified as having "'devout clientele.'" In addition, the NYPD has targeted individuals and mosques that it identified as having "ties to Salafism." The NYPD defined Salafi in its Radicalization Report as "a Sunni revivalist school of thought that takes the pious ancestors of the early period of early Islam as exemplary models." The NYPD has also singled out for suspicionless surveillance Muslim religious institutions and leaders it perceives as particularly influential in the community.

31.    Among the institutions on which the NYPD has specifically focused its suspicionless surveillance are mosques, which are central to Muslim religious life. The NYPD identified and mapped more than 250 area mosques in New York and neighboring states. NYPD officials then determined the "ethnic orientation, leadership, and group affiliations" of each mosque, either by surveilling it from the outside, or by entering the mosque to make those

determinations.   Using rakers and informants, the NYPD identified fifty-three "mosques of concern" in which the Department placed additional informants and plainclothes officers.

32.     The NYPD has placed video cameras outside of mosques to surveil congregants and collected license plate numbers of worshippers attending certain mosques, without any suspicion of criminal activity.

33.     Upon information and belief, Defendant Cohen intended to place an NYPD source in every mosque within a 250-mile radius of New York City and succeeded in placing a source in many of them.

34.     The NYPD has instructed its officers and informants to spy on and record the First Amendment-protected speech and activities of Muslim religious and community leaders and members, including students and activists.   Informants known informally as "mosque crawlers" are specifically dispatched to monitor sermons, scrutinize imams, record conversations, and collect lists of mosque attendees, all absent evidence of wrongdoing.  The NYPD's own documents show that informants have recorded conversations among mosque congregants about current events, such as the Danish cartoon controversy in early 2006 and the accidental crash of a plane into a Manhattan building in October 2006.

35.     The NYPD's mapping activities and its use of officers and informants to monitor and record Muslim New Yorkers' conversations without any suspicion of wrongdoing continue. According to the current commanding officer of the NYPD's Intelligence Division, members of the Division may be instructed to record and report on Muslim New Yorkers' conversations to determine whether they are "upset" about world events, such as "a drone attack," or discussing information that would "identify what region or what type of people they are."

36.     The NYPD has also instructed and trained informants to bait Muslim New Yorkers into making inflammatory remarks, which are then reported to the police.  One such technique is known as "create and capture," by which an informant "creates" a conversation with a Muslim New Yorker about jihad or terrorism and then "captures" and reports that individual's response to the NYPD.

37.     For example, in January 2012, a plainclothes NYPD officer recruited nineteen-year-old Shamiur Rahman to serve as an informant following his third arrest on misdemeanor drug charges.  Rahman was instructed to use the "create and capture" technique.

38.     The NYPD paid Rahman as much as $1,500 a month to: monitor conversations in mosques and among Muslim youths; listen for buzz words such as "jihad" and "revolution" and report any "radical rhetoric"; photograph imams and congregants inside mosques; collect congregants' cell phone numbers;  and collect and photograph the names of people attending study groups and classes on Islam.  Rahman provided all of this information to the NYPD, even though none of it pertained to actual or suspected criminal activity of any kind.

39.     For example, on the NYPD's instructions, Rahman attended the 2012 Muslim Day Parade in Manhattan and took pictures of people marching, which he sent to the NYPD. The NYPD also assigned Rahman to spy on a February 23, 2012 lecture at the John Jay College of Criminal Justice, even though Rahman's NYPD handler admitted to him that the police did not believe the Muslim Student Association there had done anything wrong.  Rahman's NYPD handler told him that the group should be monitored because its members were "religious Muslims" and "the NYPD considers being Muslim a terrorism indicator."

40.     The NYPD continues to use officers and informants to monitor mosques, sermons, imams, and congregants. The NYPD does not conduct similar profiling or surveillance of individuals, houses of worship, or organizations affiliated with any religion other than Islam.

41.     As part of the NYPD's Muslim Surveillance Program, the Intelligence Division generated daily reports on innocent Muslim New Yorkers' lives in New York City's neighborhoods, and the names of thousands of innocent New York City residents have been placed in secret police files, even absent evidence that they engaged in criminal activity.

42.     The information gathered by the Intelligence Division is kept both in an intelligence database and on a standalone computer used to generate intelligence reports.

43.     The highest-ranking New York City and NYPD officials have embraced the Muslim Surveillance Program, defended it, and indicated that it will continue.   Mayor Bloomberg has stated that, "We're doing the right thing.  We will continue to do the right thing." He has asserted that criticism of the NYPD's targeting of Muslims for surveillance was "just misplaced" and "pandering."

44.     None of the NYPD's suspicionless surveillance activities described here is conducted against institutions or individuals belonging to any faith other than Islam, nor are they conducted against the public at large.

**B.** **Plaintiffs' Allegations**

**NYPD Surveillance of Imam Hamid Hassan Raza and Masjid Al-Ansar**

45.     Plaintiff Masjid Al-Ansar provides Muslim worshippers in Brooklyn, New York a facility for communal prayer five times each day in accordance with the tenets of Islam, and is an important daily gathering space for its congregants.   In addition, Masjid Al-Ansar's staff provides congregants with religious education and counseling.

46.     Since September of 2008, Plaintiff Hamid Hassan Raza has served as the imam at Masjid Al-Ansar.

47.     Imam Raza teaches and counsels children, youths, and adults about the Qur'an, its teachings, and other religious topics.   He also provides religious and personal counseling to congregants.   As imam, his goal is to make Masjid Al-Ansar an inclusive religious site and community space, especially for its younger generation of congregants.

48.     By the time Imam Raza became imam at Masjid Al-Ansar, he understood from newspaper accounts and from conversations with other community members that NYPD officers and informants were monitoring mosques and sermons in New York City.

49.     Because Imam Raza was concerned about law enforcement surveillance, he began recording on video the sermons he delivered.   Imam Raza records his sermons because he is afraid that NYPD officers or informants are monitoring what he says and will quote or record some isolated part of a sermon, or take it out of context, and subject Imam Raza to further law enforcement scrutiny, or worse.

50.     Imam Raza's belief that he and Masjid Al-Ansar were the subjects of law enforcement surveillance increased markedly as a result of a visit to the mosque by two NYPD officers in late 2009, which struck Imam Raza as odd.   During this visit, the NYPD officers asked Imam Raza for his driver's license, which he provided to them.   The officers copied down some information from the license.   They told Imam Raza that there was some confusion related to his identification number, but did not explain what the confusion might be or why they needed his driver's license.   The visit struck Imam Raza as especially unusual because the officers, who identified themselves as being from the 62nd Precinct, were not in uniform.

51.     After this encounter with the plainclothes NYPD officers, Imam Raza and Masjid Al-Ansar took a number of actions out of concern that they were under NYPD surveillance.   In early 2010, Imam Raza substantially upgraded the video equipment he used to record his

sermons. He replaced the mosque's handheld video camera with a professional-grade video camera, at a cost of $1,800, and purchased for the mosque three external hard drives to save the recordings, at a cost of approximately $400. A congregant volunteered his time and labor to wire a sound system in the mosque to facilitate the recording of sermons.

52. Masjid Al-Ansar incurred these expenses in order to ensure that if NYPD officers or informants took anything in Imam Raza's sermons out of context, the mosque and its imam would be able to defend themselves by providing a high-quality recording of the full sermon.

53. Because of the disconcerting visit by the plainclothes NYPD officers, Imam Raza also stopped mentioning, in his Friday sermons, topics that might be considered controversial. These topics are discussed in greater detail below.

54. Imam Raza's belief that the NYPD was spying on him and Masjid Al-Ansar was deepened by another encounter with NYPD officers at or around the end of 2010. Masjid Al-Ansar had acquired a large number of books from another mosque that was shutting down. With help from congregants, Imam Raza unloaded approximately twenty to twenty-five garbage bags full of these books from a double-parked truck, during the daytime, and brought them into the mosque. The next day, two NYPD officers came to the mosque and told Imam Raza that they had received "a complaint" about a van double-parking in front of the mosque and bags being brought inside. The officers said they wanted to look inside the mosque "just to make sure." The officers left when Imam Raza said that he could not allow them to look inside without first getting permission from Masjid Al-Ansar's board. These NYPD officers also identified themselves as being from the 62nd Precinct. The officers were not the ones who visited Masjid Al-Ansar in 2009, but they were also in plainclothes, which again struck Imam Raza as strange.

55. In 2011, plainclothes NYPD officers claiming to be from the Department's community affairs branch visited Masjid Al-Ansar and said they wanted to "get to know the community." This visit further heightened the concerns of the mosque's leadership that Masjid Al-Ansar was under NYPD surveillance. The mosque's leadership decided to sponsor a civil rights workshop in January 2012 to inform congregants of their rights. That workshop took time away from Masjid Al-Ansar's Qur'an curriculum.

56. In early 2012, and again in July or August 2012, Imam Raza encountered newcomers to the mosque who, in Imam Raza's experience, behaved unlike other congregants

11

and whose interest in Islam seemed feigned or insincere. As a result, Imam Raza believed these men to be informants.

57.   On the first occasion, in early 2012, Imam Raza was closing the mosque after late evening prayers when a man he had never seen before entered, breathing hard, and appearing nervous. The man said he wanted to become a Muslim, but then asked Imam Raza for his views on the wars in Afghanistan and Iraq, and on how Muslims should deal with Christians and Jews. The man openly took out his phone to record Imam Raza's answers. Imam Raza believed the man might be an informant because of this strange behavior, and tried to ward him off with short and quick answers. Imam Raza told the man that he was more concerned with local affairs than those in other countries, and that the Prophet Muhammad lived peacefully with Christians and Jews. The man then suddenly asked to become a Muslim by taking the *shahada*, the declaration of Islamic faith, in front of the imam. The man also immediately asked for a copy of the Qu'ran. In Imam Raza's experience, this behavior was extremely unusual and not how people typically convert to Islam, further strengthening his belief that the man was an informant.

58.   On a later occasion, the behavior of another newcomer to the mosque heightened Imam Raza's belief that he and the mosque were under surveillance. In July or August 2012, Imam Raza gave a workshop at Masjid Al-Ansar about *da'wa*, or how to invite people to Islam. A newcomer came in late, and, during a student practice exercise, took an approach that in Imam Raza's experience was confrontational and reflected a lack of seriousness about the exercise. When Imam Raza's assistant chastised the newcomer, the newcomer became angry, and Imam Raza had to defuse the situation by calming everyone down. Imam Raza thought the entire interaction with the newcomer was strange. Later in the fall, young congregants at Masjid Al-Ansar showed Imam Raza a Facebook post in which that newcomer identified himself as Shamiur Rahman and admitted to being an NYPD informant.

59.   After confirmation that the NYPD had sent at least one informant to spy on Masjid Al-Ansar and Imam Raza, the imam and the mosque's leadership sponsored a second workshop to inform congregants of their civil rights. Like the civil rights workshop held in January 2012, this one also took time away from Masjid Al-Ansar's Qur'an curriculum.

60.   The NYPD's surveillance of Masjid Al-Ansar and its members has had a pronounced negative impact on Imam Raza's religious ministry, Masjid Al-Ansar's religious mission and activities, and the religious practices of the mosque's congregation.

61.    Imam Raza's awareness and fear of NYPD surveillance grew with each incident described above and he has altered his religious sermons and teaching practices in response.

62.    NYPD surveillance has particularly affected Imam Raza's discussions of religious topics and the religious and spiritual counsel he feels comfortable giving about current events. For example, Imam Raza generally does not discuss in his sermons or with his congregants certain topics that might be perceived by the NYPD or its informants as controversial or that might be taken out of context. These topics include current events like the war in Afghanistan. They also include the concept of jihad, which Imam Raza refrains from discussing despite his belief that jihad, which means "struggle," concerns the internal and universal struggle for human self-improvement, that it is a struggle in which all human beings are engaged, and that it is the most important struggle in Islam. Imam Raza believes that a Muslim cannot do anything in the name of jihad that would lead to harm or injustice to a fellow human being, Muslim and non-Muslim alike. But Imam Raza worries that if he were to discuss any of these topics or beliefs with an individual who was an NYPD informant, that person might distort his explanation or take parts of it out of context in reporting to the NYPD.

63.    For the same reasons, Imam Raza discourages congregants from discussing these religious concepts or current events generally at the mosque. He fears that if his congregants discuss what he might tell them, or their own views, with or in front of an informant, they would expose themselves and Masjid Al-Ansar to misunderstanding and further scrutiny by the NYPD, or worse. Plaintiff Raza asks congregants to step out of the mosque to discuss these topics, and he avoids answering congregants' questions about them.

64.    Avoiding discussion of current events and particular religious topics on which the NYPD is likely to focus prevents Imam Raza from fulfilling his duty as a religious minister, educator, and scholar in the Masjid Al-Ansar community. Because of Imam Raza's knowledge and fear of NYPD surveillance and the protective actions he has taken as a result, he feels he is failing the mosque's congregation and especially its youth by not providing full religious education and discussion, and by not providing youthful congregants with a space in which they can explore their questions about all areas of their faith and life.

65.    Knowledge and justifiable fear of NYPD surveillance have also changed Imam Raza's practices with regard to his own studies. To further his religious expertise, Imam Raza used to listen to the lectures of English-speaking Islamic scholars. But because English-speaking

scholars and their students are widely known to be the more common targets for NYPD surveillance, he now avoids them, and has largely switched to Arabic-language lecturers. This impedes Imam Raza's religious scholarship because his Arabic-language skills are not as strong as his English. He also avoids listening to religious speakers who are fiery and emotional even though they may have important lessons to teach, for fear that following those speakers is more likely to attract police attention.

66.     Knowledge and justifiable fear of NYPD surveillance have forced Imam Raza to keep his distance from newcomers to the mosque. Imam Raza is hesitant to approach newcomers until they are better known in the Masjid Al-Ansar community, further impeding his ability to fulfill effectively his role as a religious and spiritual counselor and teacher.

67.     Because Imam Raza knows the NYPD is listening to what he says and that, as a result, he is at risk of ending up in a police file either for no reason or because of a wrongful accusation, he has considered leaving the pulpit. Imam Raza is worried about the impact on his family and children if he is targeted and victimized by the NYPD because he is an imam.

68.     Each of the foregoing consequences for Imam Raza of the NYPD's Muslim Surveillance Program has also had a profoundly negative impact on Masjid Al-Ansar's ability to function as a center of religious and social life for its members and surrounding community.

69.     The NYPD's Muslim Surveillance Program has also caused other harms to Masjid Al-Ansar. For instance, in 2009, at a time when many youths came to Masjid Al-Ansar for prayer, guidance and fellowship, a friend warned Imam Raza that NYPD surveillance teams and informants were being taught "indicators" or criteria that singled out for scrutiny young, religious Muslims who grew their beards, wore Islamic garments like shorter pants, and attended mosque regularly.

70.     These "indicators" are contained in the NYPD Radicalization Report.

71.     Imam Raza understood the NYPD's reliance on these indicators to mean that police officers were likely to place gatherings of religious, young Muslim men at Masjid Al-Ansar under surveillance. As a result of the information from his friend and what Imam Raza knew to be the NYPD's practices, he found ways to encourage youths to leave the mosque between prayers. Imam Raza stopped sitting and socializing with young worshipers between prayer services, so as not to encourage them to linger at the mosque. At other times, Imam Raza would simply announce that he was closing the mosque between prayers so people would leave.

14

72.     Had it not been for NYPD surveillance and the existence of these discriminatory and stigmatizing "indicators," Imam Raza would not seek to limit his congregation's presence in the mosque.  Imam Raza's role as religious leader of Masjid Al-Ansar would normally be to make worshipers feel comfortable and to turn the mosque into a second home for them.  Imam Raza has felt forced to act contrary to his role as Masjid Al-Ansar's imam because he does not wish to expose worshipers to police surveillance.

73.     Knowledge and justifiable fear of NYPD surveillance among Masjid Al-Ansar's regular worshipers have bred a toxic, distrustful, and destructive atmosphere at the mosque, especially towards newcomers.  Almost every time that a new, unfamiliar person attends the mosque, one of the mosque's regular worshippers warns Imam Raza about the newcomer and shares suspicions that he might be a police informant.  Newcomers to Masjid Al-Ansar have reacted to this reception with alarm, telling Imam Raza that the environment at the mosque is hostile to them, that longstanding congregants view newcomers with suspicion, and that newcomers are excluded from many facets of social life at the mosque.

74.     Imam Raza has spent many hours mediating the resulting disputes among congregants, in an effort to defuse suspicions and foster an open and trusting atmosphere at the mosque.  Managing these instances of suspicion and disruption in the congregation is time-consuming and prevents Imam Raza from dealing with the other pressing responsibilities he must fulfill as Masjid Al-Ansar's religious leader.

75.     The suspicion caused by NYPD surveillance also interferes with religious ministry and teaching at Masjid Al-Ansar.  Imam Raza cannot minister or teach as effectively— and congregants cannot learn as well—when they are constantly worried whether they are safe from police spying, or when they are suspicious of their fellow worshippers.

76.     In August 2011, the Associated Press began reporting on the NYPD's Muslim Surveillance Program, based in part on leaked NYPD documents, in what became a Pulitzer Prize-winning series.  Once those stories became public, the environment of suspicion and fear only became more acute, both for Imam Raza and for Masjid Al-Ansar's congregants.  Congregants grew even more suspicious of newcomers, and a constant sense of suspicion now exists among the mosque's congregants.  There has been a steep decline in mosque attendance, as the number of worshippers attending afternoon prayers on weekdays has declined from approximately twenty people to just two or three people.  Although congregants knew that the

15

mosque was the subject of surveillance by the NYPD before the publication of the news stories, the confirmation of NYPD surveillance has increased their fears and further diminished what was once a vibrant and lively mosque community.

### NYPD Surveillance of Asad Dandia and Muslims Giving Back

77.     Since November 2011, Plaintiff Asad Dandia has been a leader of a community-based charitable organization first known as Fesabeelillah Services of NYC, Inc. ("FSNYC"), and now known as Muslims Giving Back, which is also a Plaintiff.

78.     Because charitable giving is one of the core tenets of Islam, Mr. Dandia feels compelled to help the needy members of his community, whether they are Muslim or non-Muslim. His charitable work is an important part of his religious practice and he believes that it helps him to be a better practicing Muslim.

79.     FSNYC was a community-based charitable organization founded in November 2011 to serve low-income Muslims living in New York City. It was incorporated in December 2011 with Mr. Dandia as the Vice President. It received tax-exempt status as a 501(c)(3) nonprofit organization in March 2012.

80.     FSNYC hosted small events, invited speakers to a local mosque, and emphasized the importance of charitable giving in Islam. Key FSNYC activities included helping the homeless, finding housing for families, donating money to families in times of need (like when unexpected funeral expenses came up), and, generally, fundraising to support these and other community-based charitable activities.

81.     Most FSNYC members were college-aged young men and most were students. FSNYC consisted of approximately ten to fourteen active members. In total, approximately thirty-five to forty individuals donated to FSNYC and regularly attended FSNYC events.

82.     Mr. Dandia's first contact with Shamiur Rahman, an NYPD informant, occurred on March 22, 2012. At the time, Mr. Dandia had no idea that Rahman was working for the NYPD as an informant. Mr. Dandia did not discover that Rahman was an NYPD informant until Rahman publicly admitted that fact almost seven months later. Rahman admitted to being an informant after he had become an active member of FSNYC and, later, Muslims Giving Back, as well as after he became part of Mr. Dandia's circle of friends.

83.     On March 22, 2012, Rahman sent a message to Mr. Dandia on Facebook. Mr. Dandia accepted Rahman's "friend request" because he believed that they had several friends in

common. On March 24, Rahman sent another message to Mr. Dandia on Facebook, asking whether there were "any events or anything" he could attend soon.

84.     Rahman told Mr. Dandia that he was trying to become a better practicing Muslim, and that he wanted to involve himself in FSNYC's activities. Mr. Dandia wanted to help in what he thought was Rahman's quest for religious self-improvement, and introduced Rahman to his friends in FSNYC. Rahman joined FSNYC and started to attend all FSNYC meetings.

85.     Rahman also began regularly attending Mr. Dandia's mosque, Masjid Omar in Brighton Beach, Brooklyn, even though Rahman lived in Queens. Rahman often arrived at the mosque early, before prayers, and would nap in the mosque.

86.     On several occasions, Mr. Dandia invited Rahman to his family's house, including once to spend the night. Rahman met Mr. Dandia's parents and ate with his family.

87.     Rahman asked people he met in Mr. Dandia's company for their phone number, often within minutes of meeting them. Rahman also often tried to take photographs with or of people he met through Mr. Dandia.

88.     On April 13, 2012, Mr. Dandia convened a meeting to discuss FSNYC matters. Mr. Dandia invited about twenty-five youths, mostly people who regularly prayed with him at the mosque and who had actively conducted outreach for FSNYC and publicized its activities. Rahman attended this meeting, which took place at Masjid Omar, and a photo of the group was posted on Facebook. Rahman had access to this photo and gave it to the NYPD.

89.     On April 24, 2012, Mr. Dandia sent messages on Facebook to several FSNYC members, including Rahman, to seek donations for the organization. Rahman responded and said he would raise money.

90.     On April 25, 2012, a friend told Mr. Dandia that he had heard from a credible source in the NYPD Intelligence Division that an informant had infiltrated FSNYC.

91.     On April 29, 2012, another friend told Mr. Dandia that he had heard that NYPD informants had been sent to infiltrate FSNYC. This friend strongly advised Dandia to step down from FSNYC because he was worried that Mr. Dandia would be targeted by the informants.

92.     Mr. Dandia decided not to resign from FSNYC because he knew that he had not done anything wrong. Nonetheless, as a result of learning that one or more NYPD informants had infiltrated FSNYC, Mr. Dandia personally stopped publicizing FSNYC activities through social networking sites and stopped following up on many matters for FSNYC.

93.     On the evening of April 29, 2012, Mr. Dandia told some of his friends who were also FSNYC members about the NYPD informants. One FSNYC board member decided to be less active with the organization out of concern that it had been infiltrated by the NYPD.

94.     Through the late spring of 2012, FSNYC operated at a significantly lower level of activity than it had before the FSNYC board and members learned that there were NYPD informants in the organization's midst.

95.     After the FSNYC members learned about the NYPD informants, the organization hosted only one major event, which had been long planned. FSNYC had invited Napoleon, a former rapper who had become an Islamic speaker, to headline the event. Several members told Mr. Dandia that after the Napoleon event was concluded, they would cease their activities with FSNYC, largely because they were fearful of being spied upon by an NYPD informant.

96.     On June 3, 2012, the Napoleon event took place at Masjid al-Farooq, a mosque in Brooklyn. Following this event, FSNYC ceased holding events and charitable activities.

97.     Soon after, Mr. Dandia spoke with a handful of friends about reviving their community involvement. They decided to create a new group of young men who wanted to perform community service as part of their religious practice. This group continued FSNYC's work under the name Muslims Giving Back, and Mr. Dandia serves as the organization's Vice President.

98.     On July 7, 2012, Mr. Dandia participated in the first Muslims Giving Back shopping trip to purchase food for donation to needy families in their community. On July 8, Muslims Giving Back had its first informal organizational meeting.

99.     Mr. Dandia obtained permission from a religious leader at Masjid Omar for Muslims Giving Back to construct a bulletin board at the back of the mosque in order to display photos of purchased food and to request donations. The announcement on the bulletin board helped Muslims Giving Back raise money for the community and gave the organization legitimacy within the mosque.

100.    Throughout the summer of 2012, Muslims Giving Back worked to fundraise and distribute food donations to needy community members. During this time, Rahman remained active within the charity's group of volunteers.

101.    On at least one occasion, in September 2012, Rahman initiated a conversation among Muslims Giving Back's members about potentially controversial topics related to current

events. That occasion took place after Friday prayers, when Mr. Dandia and eight or nine other Muslims Giving Back members were gathered together outside Masjid Omar. Rahman asked the group what it thought about the attacks on the United States consulate in Benghazi, Libya, which had occurred earlier that week. His question caught Mr. Dandia and others in the group by surprise as it was out of context given the specific setting, their preceding conversation, and that particular gathering. One of Mr. Dandia's friends in the group attempted to end the conversation by saying there was no reason to discuss the topic, and several of the young men dispersed. A smaller group of the remaining youths, including Rahman, moved inside the mosque.

102.   Once inside, Rahman again attempted to initiate a conversation, this time asking people for their opinions about political developments in the Middle East, including the Benghazi attacks and the Syrian revolution. The conversation got very heated because those present did not want to have the discussion with Rahman. Several of those present got up and left, saying that they were not comfortable having the discussion.

103.   Later that day, Mr. Dandia received a call from one of his friends who had been part of the group at the mosque, asking Mr. Dandia to come to his home so that they could speak. Once Mr. Dandia arrived, he saw that another one of his friends was also there. Mr. Dandia's two friends told him that they thought that Rahman was a "spy," and the group discussed their concern that Rahman might be an informant.

104.   On October 2, 2012, Rahman posted a message to his Facebook account in which he revealed that the NYPD had employed him as an informant and sent him to infiltrate Muslim communities and organizations.

105.   Once it became public that Rahman had infiltrated Muslims Giving Back as an NYPD informant, the charity was stigmatized, and its reputation and legitimacy within the Brighton Beach community was deeply damaged. Muslims Giving Back has not been able to maintain its previous level of activity in the community. Its ability to raise funds for, and fulfill, the charitable goals and activities it was formed to accomplish has suffered greatly.

106.   About ten days after Rahman disclosed that he was an NYPD informant, a religious leader at Masjid Omar asked Mr. Dandia to remove the Muslims Giving Back bulletin board and told him that Muslims Giving Back would no longer be permitted to solicit donations from Masjid Omar community members after Friday services. These events have been a major blow to the charity's viability.

107.    To raise money for its charitable work, Muslims Giving Back used to rely on the weekly solicitation of funds from the Masjid Omar congregation after Friday prayers. Each week, Muslims Giving Back (and FSNYC before it) typically raised a few hundred dollars of donations in this way. The largest amount of donations raised in one week was $800. Now, Muslims Giving Back struggles to raise funds to buy food and serve the community's needs, and to raise the $308 per month required to rent the storage facility where it stores donated food.

108.    The religious leader at Masjid Omar also asked Mr. Dandia to stop holding Muslims Giving Back meetings at the mosque and to avoid bringing new people to the mosque. Before that point, Masjid Omar was the primary meeting place for Muslims Giving Back, and new volunteers regularly came to the mosque. Muslims Giving Back members now gather in front of the mosque, but do not meet inside of it.

109.    The revelation that Rahman was an NYPD informant has also harmed the ability of Muslims Giving Back to publicize its charitable activities and attract new members.

110.    On October 26, 2012, Muslims Giving Back learned from a CNN news program that Rahman had sent a photo of some of its members to the NYPD. After that, the organization stopped posting public pictures of its members engaging in charitable work. Previously, Muslims Giving Back posted such pictures as part of its community outreach, and to encourage other young Muslims to join. Now, its members are concerned that such visibility will draw law enforcement attention, and the organization only posts public photos of members with their faces blurred. This fear of public exposure has harmed the charity's ability to promote its work and to serve as an example to other young Muslims.

111.    Although Muslims Giving Back still aims to serve the community by purchasing and delivering food to poor Muslim and non-Muslim families in Brooklyn, the charity's goals have been impeded by the NYPD's infiltration and surveillance. In addition to the negative impact detailed above of NYPD spying on the organization's fundraising and ability to engage in charitable work, the members' sense of community has been damaged.

112.    Since Rahman confessed to being an NYPD informant, Mr. Dandia fears further NYPD surveillance and as a result, he has changed his personal approach to the charitable community work that is so essential to his religious beliefs, to the detriment of his beliefs and practices. In an effort to encourage other Muslims his age to participate in charitable work, Mr.

Dandia used to try to be as inclusive and public as possible about his work. Now, Mr. Dandia communicates primarily with people he knows personally.

## NYPD Surveillance of Masjid At-Taqwa

113.   Masjid At-Taqwa is a mosque serving the Muslim community in Brooklyn, New York, and is an important daily gathering space for its congregants. In addition to prayer services five times a day, Masjid At-Taqwa provides its congregants and the community with classes on religious topics and religious and personal counseling from the mosque's staff. The religious and personal counseling is vitally important for Masjid At-Taqwa's congregants, and ranges from marital counseling to guidance on family affairs to funeral services.

114.   Imam Siraj Wahhaj has led the Masjid At-Taqwa congregation since its founding in 1981. Imam Wahhaj is also a clergy liaison for the NYPD Community Affairs Bureau and a member of the Majlis Ash-Shura, the Islamic Leadership Council of Metropolitan New York. Osman A. Adam is the Assistant Imam at Masjid At-Taqwa. Ali Abdul Karim is the head of security for Masjid At-Taqwa. He also serves a ministerial role, counseling congregants and lecturing on Islamic topics. Mr. Abdul Karim further serves as a volunteer chaplain for the New York City Department of Correction on Rikers Island.

115.   Imam Wahhaj, Assistant Imam Adam, and Mr. Abdul Karim serve as Masjid At-Taqwa's primary religious staff and form part of its leadership.

116.   In 2004 or 2005, the NYPD installed a surveillance camera, prominently marked with the Department's insignia, outside Masjid At-Taqwa. The camera lens pointed toward the entrance of the mosque. Its installation demonstrated both to the mosque's leadership and the congregation that the mosque was under NYPD surveillance.

117.   The camera intimidated congregants and caused anxiety among them. Masjid At-Taqwa's religious leaders observed that instead of staying at the mosque after prayer services to speak about religious matters and socialize as they normally would, congregants began leaving immediately following prayers. Some congregants told the mosque's leadership that they were concerned the camera was recording their prayer patterns. Congregants started staying away from the mosque. Islam encourages communal prayer, and the NYPD surveillance interfered with the mosque's ability to provide a forum for communal prayer and its congregants' ability to practice their faith fully.

118. Imam Wahhaj was specifically forced to take time out of his schedule to reassure anxious congregants about surveillance both individually and in Friday sermons. These practices left Imam Wahhaj with less time to spend on religious and spiritual matters.

119. Anxiety ran particularly high among immigrant congregants, some of whom told the mosque's leadership that they feared the NYPD's surveillance would somehow lead to deportations or interfere with their ability to secure legal permanent residency. Indeed, after the installation of the camera, a large group of immigrant congregants left Masjid At-Taqwa permanently.

120. Because of the fear and anxiety that the camera generated in the Masjid At-Taqwa community, the mosque's leaders met with the commanding officer of the NYPD's 79th Precinct and the precinct's community affairs liaison to ask that it be removed. Masjid At-Taqwa's leadership informed the NYPD officers that the camera's presence was causing congregants to stay away from the mosque.

121. The NYPD moved the camera across the street some time later, but it remains pointed at Masjid At-Taqwa today.

122. The presence of the NYPD surveillance camera added to the suspicion of Masjid At-Taqwa's religious leaders and congregants that the NYPD was also placing informants or officers in the mosque to surveil them.

123. After the installation of the camera, religious leaders feared on a daily basis that the mosque was under unwarranted police scrutiny and they began taking precautionary measures to protect their congregation, all of which they continue to take.

124. Mosque leaders began asking new congregants for information about their backgrounds and the names of previous mosques they had attended. Masjid At-Taqwa revised the forms given to new congregants to seek more personal information in order to help determine whether they were genuine new worshippers, or, instead, informants. The mosque's religious leaders began the practice of making regular announcements to congregants about the possibility that informants were present. Each of these practices deeply troubles them because suspicion towards other Muslims and doubt about the sincerity of their statements is contrary to important Islamic principles of community, brotherhood, and sisterhood.

125. As a further precaution, Masjid At-Taqwa's leaders ensured they were recording their religious sermons and lectures. Although they had previously recorded sermons and

lectures to sell and generate income for the mosque, after the installation of the NYPD camera, Masjid At-Taqwa's leaders took care to make and retain recordings to defend the mosque in the event that an NYPD officer or informant misrepresented the content of their religious speech or took it out of context. For the same reason, Masjid At-Taqwa's leaders began to spend extra time in their sermons explaining their religious beliefs and statements.

126.    Because of religious leaders' concern that any newcomer to Masjid At-Taqwa who sought religious and spiritual advice could be an informant, the mosque's staff began to include a third party as a witness in their religious counseling conversations, even though the conversations should normally be private. This precaution interferes with the ability of the mosque's religious leaders to be accessible and welcoming to new congregants, who in turn are less likely to join the mosque as a result. Additionally, some congregants understandably do not feel comfortable with a third party's presence in a counseling conversation that may involve private, personal matters, which prevents them from receiving complete religious guidance. Because religious leaders fear monitoring by the NYPD, they also tell new and existing congregants that they cannot guarantee the confidentiality of any conversation, no matter how intimate the topic. This further impairs the ability of congregants to seek religious guidance and personal counseling, and the ability of Masjid At-Taqwa's staff to provide it.

127.    The suspicion of Masjid At-Taqwa's religious leaders that the NYPD was sending informants to infiltrate the mosque was confirmed when it became public that the NYPD had placed informants in Masjid At-Taqwa as early as 2006 and as late as 2012.

128.    In 2011, the Associated Press began publishing its articles about the NYPD's Muslim Surveillance Program based in part on the NYPD's own documents. One NYPD document contained an informant's report on a discussion with the informant about a plane crash in Manhattan on October 11, 2006, and telephone calls made by Assistant Imam Adam to others. In news accounts published the day after the crash, New York City officials dismissed the notion that it was a terrorist attack. Nonetheless, the NYPD document, an Intelligence Division Intelligence Note dated October 16, 2006, summarizes reports from informants and/or officers spying on the reactions of imams and congregants at five mosques in Brooklyn, Queens, Corona, and Jersey City, including Masjid At-Taqwa. In the Intelligence Note, Assistant Imam Adam is described as "agitated after hearing news of crash." With reference to "discussions with CI [confidential informant] about the possibility of another attack," Assistant Imam Adam is

described as saying he was "not aware that something might happen." The Intelligence Note nevertheless states that a "Phone dump will be conducted on subject's phone for that day and time period."

129. Assistant Imam Adam recalls that when the plane hit a Manhattan building, he was concerned about the crash, tried to understand what had occurred, and spoke to people by phone. He and other congregants at Masjid At-Taqwa were fearful that blame would be ascribed to Muslims, or that someone might decide to hurt Muslims in a hate crime.

130. A second Associated Press article confirmed that Shamiur Rahman was an NYPD informant who had infiltrated the mosque. Rahman also spied on and reported to the NYPD about the religious lectures and teachings of Imam Wahhaj and Mr. Abdul Karim.

131. Shamiur Rahman came to Masjid At-Taqwa in 2012. At the time, Assistant Imam Adam and other congregants suspected that Rahman was an informant because of his odd behavior. A congregant complained to Assistant Imam Adam that a man (later confirmed to be Rahman) was questioning people in the mosque about the September 11, 2001 attacks and Usama bin Laden, and saying that Muslims "should take action and do something." Assistant Imam Adam told the man that he was in a mosque and welcome if he wanted to pray, but that he should not discuss historical events like September 11 or people like bin Laden. Assistant Imam Adam told the man not to bring up the subjects again, and that if he did, he would be banned from the mosque. The man left a few minutes later, and Assistant Imam Adam never saw him again.

132. On approximately twenty occasions in the past ten years, Assistant Imam Adam has told individuals to leave the mosque after congregants complained that they behaved like informants by asking questions similar to those asked by Rahman.

133. Confirmation in the Associated Press stories that Masjid At-Taqwa has been under NYPD surveillance, as its religious leaders and congregants long suspected, has further stigmatized the mosque as somehow involved with suspicious behavior. This negative image constitutes an ongoing harm to Masjid At-Taqwa as a religious community. Masjid At-Taqwa used to hold social activities every three to six months, which were attended by anywhere from fifty to 100 people and often included discussion of current events of interest to the community. Since the release of the Associated Press stories, it has ceased holding these events for fear that they will heighten NYPD surveillance of the congregation. The mosque has also cancelled

24

annual community events, including whitewater rafting, camping, and paintball trips. As a result, congregants lack important opportunities to socialize and bond with one another.

## NYPD Surveillance of Mohammad Elshinawy

134.    Plaintiff Mohammad Elshinawy has taught, lectured, and given sermons about Islam at various Islamic institutions in New York City for the last eleven years.

135.    Mr. Elshinawy offers all of his religious sermons, lectures, and classes on a voluntary basis. He does not accept any fees or honoraria because he believes that religious outreach and instruction are part of his religious duties as a Muslim.

136.    Mr. Elshinawy has suspected that the NYPD has been spying on him since approximately 2004, while he was a student at Brooklyn College. This suspicion was based on the fact that attendees at his lectures and congregants at mosques at which he delivered sermons warned Mr. Elshinawy that the NYPD had questioned them about him, or had asked them to inform on the contents of his religious lessons and sermons.

137.    Over this same period, Mr. Elshinawy was approached by individuals he suspected or later discovered were NYPD officers or informants.

138.    Mr. Elshinawy suspected an individual named Bilal of being an informant. In approximately the fall of 2004, Bilal began attending Mr. Elshinawy's lectures and classes regularly. Mr. Elshinawy suspected that Bilal might be an informant who was recording his lectures because, despite being the most frequent attendee, Bilal did not listen to the lectures and instead regularly fell asleep minutes after each one began.

139.    Mr. Elshinawy's suspicion that Bilal was an informant was heightened in 2006, when Bilal told Mr. Elshinawy that he wanted to "do something" for Islam. Mr. Elshinawy responded that Bilal should partake in outreach and spread the faith, but Bilal said he was "tired of talking." Suspecting that Bilal might be steering the conversation towards discussion of violence, Mr. Elshinawy told him that he should channel any anger towards explaining Islam and exemplifying Islamic manners—and immediately ended the conversation. After that, Bilal stopped attending Mr. Elshinawy's lectures.

140.    In 2005, Mr. Elshinawy socialized with a young man whom he later found out was an NYPD undercover officer going by the name Kamil Pasha. Not knowing that Pasha was an NYPD undercover officer, Mr. Elshinawy attended several community events with him, including a paintball trip organized by the Brooklyn College Islamic Society.

25

141.    In approximately 2008 or 2009, a young man who had been attending Mr. Elshinawy's religious lectures told him that NYPD officers had offered to pay the young man money if he were to report to the NYPD on the content of the lectures.

142.    In 2012, NYPD informant Shamiur Rahman was sent to spy on Mr. Elshinawy at two Brooklyn mosques at which he lectured, Masjid Al-Ansar and Masjid Al-Farouq.

143.    The NYPD also directly approached Mr. Elshinawy on several occasions, which added to Mr. Elshinawy's concern that he was being surveilled. The first time, in 2008, NYPD Detective O'Gara came to the Al-Noor School where Mr. Elshinawy was a teacher and asked him questions about a missing person.

144.    In December 2009 or January 2010, immediately after Mr. Elshinawy returned from a trip to Egypt, where he had been visiting relatives, Detective O'Gara called and asked Mr. Elshinawy for a meeting. Mr. Elshinawy told him that he would not meet without an attorney. Later in 2010, Detective O'Gara left a message on Mr. Elshinawy's answering machine, again saying that he would like to meet.

145.    Mr. Elshinawy's knowledge of and concern about NYPD surveillance and informants attending his religious lectures have caused him to alter the content of those lectures. For example, he avoids teaching about certain periods in Islamic history, like the history of Islam in the Iberian Peninsula, because he worries that his teachings will be misreported to or misinterpreted by the NYPD. Similarly, Mr. Elshinawy feels that he must alter Islamic historical narratives, particularly those highlighting valor, heroism, or anything that can be construed as lauding Islamic achievements. In his Friday sermons, Mr. Elshinawy shies away from discussing potentially controversial, political topics, or current events.

146.    Because Mr. Elshinawy fears his statements may be distorted or taken out of context, the NYPD surveillance prevents him from communicating his religious beliefs as fully and accurately as he would like.

147.    Concerns about surveillance have also led Mr. Elshinawy to refrain from holding study circles in public locations, and to avoid participants he does not personally know. Before 2010, a group of young men including Mr. Elshinawy would gather each week to eat Chinese food and discuss various Islamic topics. When two or three new individuals began attending the meetings, the original group became concerned that they were informants. At first, the study group decided to move its meeting location, but ultimately they canceled the meetings entirely.

148.    Because of the multiple incidents involving Detective O'Gara and other NYPD agents in Mr. Elshinawy's immediate circles, he has acquired a reputation as someone who is under NYPD surveillance.    That reputation has been further entrenched by the common knowledge in New York's Muslim communities that the NYPD takes a keen interest in Islamic scholars whom it considers Salafi in orientation and also influential.

149.    Mr. Elshinawy's reputation as someone who is under NYPD surveillance has affected the audiences for his religious lectures and his relationships with others in his community.    Longtime friends have stopped attending his sermons and, in some instances, stopped associating with Mr. Elshinawy altogether.

150.    For example, approximately six or seven years ago, a childhood friend of Mr. Elshinawy informed him that his mother had asked that he avoid interacting with Mr. Elshinawy. The friend's mother believed Mr. Elshinawy was under law enforcement scrutiny because one of his fellow Brooklyn College Islamic Society members had been visited by law enforcement and questioned about Mr. Elshinawy.

151.    Similarly, in 2011, another friend of Mr. Elshinawy suddenly stopped his regular attendance at Mr. Elshinawy's sermons and lectures.    Mr. Elshinawy believes this occurred because the friend's family expressed concerns about interacting with Mr. Elshinawy.    Since 2011, Mr. Elshinawy has barely seen that friend.

152.    Mr. Elshinawy's reputation as a subject of NYPD surveillance has also caused religious institutions to distance themselves from him in order to avoid similar scrutiny.

153.    As an active member of the Brooklyn Islamic Center ("BIC") mosque who was interested in maintaining and increasing the mosque's membership, Mr. Elshinawy regularly proposed prominent speakers whom he believed would attract large, young audiences.    But in the period that he lectured at the mosque between October 2008 and December 2010, the BIC leadership rejected all but two of the nine speakers Mr. Elshinawy proposed.    BIC leaders told Mr. Elshinawy that they were afraid to host speakers or events he proposed because those events or speakers would result in even more unwarranted NYPD scrutiny.

154.    Likewise, Mr. Elshinawy's reputation as someone likely to trigger baseless NYPD surveillance has prevented him from being formally recognized as a member or leader within organizations with whom he works closely.

155.     For example, when Masjid Al-Ansar in Brooklyn first opened in 2008, several of the founding members suggested that it would be unwise for Mr. Elshinawy to hold a leadership position or serve on the mosque's board, even though he was instrumental in establishing the new mosque. The board members were concerned that Mr. Elshinawy was young, considered by the NYPD to be Salafi, and wore a long beard—all factors that could invite discriminatory and unjustified NYPD scrutiny. As a result, Mr. Elshinawy did not join the board.

156.     Mr. Elshinawy's continued role and involvement with that mosque is precarious. He worries that the mosque's leadership could easily ask him to leave in the event of any religious or strategic disagreement, without providing any justification or process. Mr. Elshinawy also does not derive any of the benefits and stature that would accompany his formal involvement in the institution. This, in turn, hinders his ability to practice, teach, provide counsel, and mentor Muslim youth.

157.     Mr. Elshinawy believes that NYPD surveillance of Muslim organizations or groups also prevents him from fully exercising his religious duties to spread Islamic teachings and reach large audiences with his religious message.

158.     For example, in 2008 and 2009, news items about NYPD interest in Muslims participating in outdoor activities, described as "Jihad training," prompted BIC to cancel summer camping trips that Mr. Elshinawy wished to organize. Mr. Elshinawy had hoped the trips would foster a greater sense of community, but BIC leadership feared attracting unwarranted NYPD scrutiny.

159.     Similarly, the BIC organizers of a lecture by a prominent Islamic scholar forbade Mr. Elshinawy from helping to advertise the event among youth networks using e-mail lists, social media, and other forms of outreach, which he hoped would draw a large attendance. One of the organizers told Mr. Elshinawy that a large turnout was precisely what the organizers wanted to avoid, for fear of prompting unjustified NYPD surveillance.

160.     These fears that large events open to Muslim youth will result in NYPD surveillance further hinders Mr. Elshinawy's ability to serve as a mentor and advisor to Muslim youth. Mr. Elshinawy believes that it is his religious duty to provide counseling and guidance to young people, and to plan extracurricular activities that would keep youth off the streets, avoiding drugs and other negative influences that plague their communities and neighborhoods.

Because of knowledge and fear of unwarranted NYPD surveillance, Mr. Elshinawy's religious goals and practices have been curtailed.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE FOURTEENTH AMENDMENT
### EQUAL PROTECTION CLAUSE
### Jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983

#### (Against all Defendants by all Plaintiffs)

161.    As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiffs for police surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  By intentionally singling out Plaintiffs in this manner, Defendants have stigmatized them as members of a religious community and condemned their religion as one that is the subject of intense suspicion and distrust, different from any other religion.  Defendants' policy and practice is discriminatory in purpose and effect.  It does not serve a legitimate government interest and is not narrowly tailored.  By discriminating against Plaintiffs in this manner, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and will continue to do so if Plaintiffs are not afforded the relief sought below.

### SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FIRST AMENDMENT
### RIGHT TO FREE EXERCISE OF RELIGION
### Jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983

#### (Against all Defendants by all Plaintiffs)

162.    As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiffs for police surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This policy and practice is not neutral or one of general applicability, and has placed a substantial burden on Plaintiffs' religious exercise in the practice of their faith.  It has unjustifiably subjected Plaintiffs to adverse treatment because of their religion.  It does not serve a legitimate government interest and is not narrowly tailored.  As a result, Defendants have violated the Free Exercise Clause of the First Amendment to the United States Constitution and will continue to do so if Plaintiffs are not afforded the relief sought below.

30

## THIRD CLAIM FOR RELIEF

### VIOLATION OF THE NEW YORK STATE CONSTITUTION
### RIGHT TO FREE EXERCISE OF RELIGION, ARTICLE I, § 3
### <u>Jurisdiction under 28 U.S.C. § 1367</u>

#### (Against all Defendants by all Plaintiffs)

163.    As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiffs for police surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This policy and practice is not neutral or one of general applicability, and has placed a substantial burden on Plaintiffs' religious exercise in the practice of their faith.    It has unjustifiably subjected Plaintiffs to adverse treatment because of their religion.  It does not serve a legitimate government interest and is not narrowly tailored.  As a result, Defendants have violated Article I, § 3 of the New York State Constitution and will continue to do so if Plaintiffs are not afforded the relief sought below.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF THE FIRST AMENDMENT
### ESTABLISHMENT CLAUSE
### <u>Jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983</u>

#### (Against all Defendants by all Plaintiffs)

164.    As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiffs for police surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This policy and practice has stigmatized Plaintiffs, and makes explicit and intentional distinctions between Plaintiffs and individuals or institutions belonging to any other religious group.  It has had the effect of inhibiting Plaintiffs' religious goals, conduct, and practice, and fosters an excessive government entanglement with religion by, among other things, subjecting Plaintiffs to intrusive surveillance, heightened police scrutiny, and infiltration by police informants and officers.  It does not serve a legitimate government interest and is not narrowly tailored.  By targeting Plaintiffs for police surveillance because of Plaintiffs' religious beliefs and practices, Defendants have violated the Establishment Clause of the First Amendment of the

United States Constitution and will continue to do so if Plaintiffs are not afforded the relief sought below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

1. Declaring that the policies, practices, acts, and omissions of Defendants described here are unlawful and violate Plaintiffs' rights under the Constitution of the United States and the Constitution of the State of New York;

2. Permanently enjoining the Defendants and their agents, employees, successors, and all others acting in concert with them, from subjecting Plaintiffs to the unconstitutional and unlawful practices described here;

3. Ordering Defendants to expunge all records of Plaintiffs created and maintained as a result of the unconstitutional and unlawful practices described here;

4. Prohibiting Defendants from engaging in surveillance or other law enforcement activity based solely or predominantly upon the religion of the individuals or institutions against whom that surveillance or law enforcement activity is directed;

5. Appointing a monitor to ensure that the City of New York complies with the injunction provisions of any decree that the Court enters, and entering an order retaining jurisdiction over this action to ensure that the City complies with such a decree;

6. Awarding Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 42 U.S.C. § 1988;

7. Awarding pre-judgment and post-judgment interest, to the fullest extent allowable by law, on the foregoing monetary awards; and

8. Granting such other and further relief that the Court deems just and proper.

Dated: June 18, 2013

Respectfully submitted,

Hina Shamsi (HS-6908)
Nusrat J. Choudhury (NC-2676)
Patrick Toomey (PT-4354)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
hshamsi@aclu.org

Ramzi Kassem (RK-3567)
Diala Shamas (DS-4123)
CLEAR project
Main Street Legal Services, Inc.
CUNY School of Law
2 Court Square
Long Island City, NY 11101
T: 718.340.4558
F: 718.340.4478
ramzi.kassem@law.cuny.edu

Arthur N. Eisenberg (AE-2012)
Mariko Hirose (MH-0313)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
T: 212.607.3300
F: 212.607.3318
aeisenberg@nyclu.org