**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

HAMID HASSAN RAZA; MASJID AL-ANSAR;
ASAD DANDIA; MUSLIMS GIVING BACK;
MASJID AT-TAQWA; MOHAMMAD
ELSHINAWY,

       Plaintiffs,

          v.

CITY OF NEW YORK; MICHAEL R.
BLOOMBERG, in his official capacity as Mayor of
the City of New York; RAYMOND W. KELLY, in
his official capacity as Police Commissioner for the
City of New York; DAVID COHEN, in his official
capacity as Deputy Commissioner of Intelligence
for the City of New York,

       Defendants.

No. 13-cv-03448-PKC-JMA

Hon. Judge Pamela Chen

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR EXPEDITED DISCOVERY**

      Plaintiffs respectfully submit this memorandum in support of their Motion for Expedited

Discovery in anticipation of their motion for a preliminary injunction.

      As alleged in Plaintiffs' Complaint, the New York City Police Department ("NYPD") has

engaged in an unlawful policy and practice of religious profiling and discriminatory surveillance

of New York Muslims. The NYPD's own records, revealed through investigative reporting,

confirm that its Intelligence Division has singled out Muslim religious and community leaders,

mosques, organizations, businesses, and individuals for pervasive surveillance that is not visited

upon the public at large or upon institutions or individuals belonging to any other religious faith.

A number of these documents further confirm that Plaintiffs have been subjected to the NYPD's policy and practice of discriminatory and unlawful surveillance. Nonetheless, the record before the Court would be incomplete if Plaintiffs are not permitted limited discovery in support of their motion for a preliminary injunction. As set forth below, Plaintiffs must have an opportunity to show how Defendants' broad-based suspicion of Muslim New Yorkers, as a group, contributed to the NYPD's specific investigations of Plaintiffs, subjecting them to heightened and unwarranted police scrutiny.

Plaintiffs seek a preliminary injunction, and request this expedited discovery, because Defendants' statements and media reports concerning the extent of the NYPD's surveillance of mosques since the filing of this suit have given alarming new substance to the NYPD's discriminatory surveillance of Plaintiffs. These developments show, even more emphatically than before, that the NYPD continues to view Plaintiffs as legitimate targets for police investigation on the basis of their protected religious activities and associations. As a result, Plaintiffs' justifiable fear of discriminatory NYPD surveillance has grown immensely, as has the stigmatizing effect of this suspicion and surveillance, deeply harming Plaintiffs in their communities.

## I.      Plaintiffs' Request for Expedited Discovery

Plaintiffs seek expedited discovery in order to set before the Court additional facts demonstrating (1) the NYPD's policy and practice of investigating Muslims on the basis of their religion, and (2) the application of this discriminatory policy and practice to the NYPD's surveillance of Plaintiffs. These facts will assist the Court in evaluating the ways in which Plaintiffs' Muslim religion played a critical role in the NYPD's decision to investigate—and

investigations of—Plaintiffs' speech, beliefs, and activities, particularly as compared to other religious groups and their members. For these reasons, Plaintiffs' discovery request seeks Intelligence Division documents concerning Plaintiffs, as well as policy guidance and comparator evidence that will allow the Court to fairly assess the role of religion in the NYPD's investigations of Plaintiffs. *See* Plaintiffs' First Request for the Production of Documents (attached to Plaintiffs' Notice of Motion as Schedule A).

Plaintiffs' requests for discovery are tied directly to the substance of their constitutional claims. Plaintiffs allege that Defendants have subjected them to unwarranted police scrutiny and investigation based on their religious faith, as part of a program that targets Muslims for heightened surveillance and suspicion. To prove their claims under the Equal Protection and Establishment Clauses, Plaintiffs will show that Defendants had a discriminatory purpose or intent in their monitoring and investigation of Plaintiffs.[1] *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985); *Larson v. Valente*, 456 U.S. 228, 252, 255 (1982). Plaintiffs can demonstrate the requisite intent in two ways. First, they can establish that the NYPD expressly classified Muslims by adopting a policy of singling them out for heightened police scrutiny. But second, to the extent that Defendants claim they had a legitimate law enforcement interest in Plaintiffs, Plaintiffs can nevertheless establish discriminatory purpose by showing that they were subject to NYPD investigations of unequal and unwarranted scope, duration, and invasiveness as a result of their religious beliefs and activities.

---

[1] Similarly, under the Free Exercise Clause, Plaintiffs will establish that the NYPD surveillance program applied to them was not neutral or generally applicable. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

Even by Defendants' logic, Plaintiffs are entitled to discovery that goes beyond those NYPD documents that mention Plaintiffs specifically. Indeed, Defendants appear to agree that their intent is relevant to the existence of "a constitutional violation" in this case. *See* Defs.' Letter of Sept. 10, 2013 at 2, 5 ("NYPD Letter") (attached as Ex. A to the Declaration of Patrick Toomey ("Toomey Decl.")). Yet, in their arguments to this Court, Defendants attempt to limit the initial phase of discovery to only one *aspect* of the constitutional inquiry: their claim of a legitimate investigative interest in Plaintiffs. *See id*. But the Court cannot properly evaluate Plaintiffs' discrimination claims on the basis of the one-sided discovery proposed by Defendants. As detailed in the Complaint, the NYPD's far-reaching investigations of Plaintiffs must be informed by context. Part of that context is the Defendants' use of Muslim faith and association as a proxy for criminal suspicion generally. Thus, strategy- and policy-level documents describing the Intelligence Division's programmatic interest in Muslims—or, for example, associated "ancestries of interest"—are plainly relevant to the existence and operation of discriminatory purpose in this case. NYPD Intelligence Division, Analytics Unit PowerPoint Presentation at 22, http://bit.ly/1alTs2A (attached as Toomey Decl., Ex. B).

Moreover, even if some legitimate basis for NYPD surveillance of Plaintiffs existed, which Plaintiffs do not concede, that is not the end of the matter, for at least three reasons. *First*, as the abundance of cases involving mixed motives show, discriminatory purpose frequently stands alongside other motives. *See, e.g.*, *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Howard v. Senkowski*, 986 F.2d 24, 29–30 (2d Cir. 1993). These purposes are not mutually exclusive, and the law enforcement context is no different. The Court's task is to evaluate the role of bias in the challenged conduct, after considering the evidence on both sides.

*Cf. United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) ("[I]f the trier of fact is unpersuaded that race did *not* contribute to the outcome of the decision, the equal protection claim is established." (emphasis added)). *Second*, and relatedly, Plaintiffs argue that their religion was, at a minimum, an impermissible plus factor in the NYPD's decisions to monitor or investigate them. As a result, the Court must determine whether a discriminatory motive prompted the NYPD to subject Plaintiffs to more invasive, wider-ranging, or longer-running investigations than would have otherwise been the case.[2] And *third*, permitting discovery into Defendants' discriminatory purpose allows the Court to fairly judge the credibility of Defendants' proffered alternatives. Conduct that may appear reasonable in isolation, or based on partial facts, can lose that cast when set against the backdrop of a broader program of discrimination. In sum, the mere existence of some individualized interest in Plaintiffs does not automatically negate Plaintiffs' claims, as Defendants would have the Court believe. *See* NYPD Letter at 2, 5. Plaintiffs have made a detailed showing of discriminatory purpose in the Complaint, which is borne out by dozens of documents currently in the public record. Defendants have not moved to dismiss the Complaint, for good reason. Going forward, the Court's adjudication of Plaintiffs' motion for a preliminary injunction requires a full view of the facts—in which Plaintiffs have a fair opportunity to prove their claims of discrimination and to contest Defendants' attempts to vilify them before the Court.

---

[2] *Cf. Floyd v. City of N.Y.*, __ F. Supp. 2d __, 2013 WL 4046209, at *75 (S.D.N.Y. Aug. 12, 2013) (appeal pending). Defendants' position that religious discrimination "cannot exist provided that an [investigation] is based on reasonable suspicion" is "fundamentally inconsistent with the law of equal protection . . . the Constitution prohibits *selective* enforcement of the law based on considerations such as [religion]," and Plaintiffs' discrimination claims do not depend on proof that the NYPD's investigations were suspicionless. *Id.*

Because Plaintiffs seek discovery on an expedited basis, they have narrowed their request in time and scope, limiting the discovery sought to the following categories of materials:

1. <u>Intelligence Division documents concerning Defendants' surveillance and investigation of Plaintiffs</u>

The parties appear to be in agreement that Plaintiffs are entitled to Intelligence Division documents concerning Plaintiffs themselves, whatever those documents may be formally labeled in the NYPD's files. Plaintiffs would strenuously object, however, to any effort by Defendants to artificially limit this category of materials—for instance, by narrowly defining what constitutes an "investigation" or "surveillance" of both the individual and organizational Plaintiffs.

Thus, Plaintiffs strongly object to Defendants' suggestion, at the October 7, 2013 hearing, that they may redact from these very documents information relating to Defendants' surveillance or investigation of others. Given the breathtaking scope of Defendants' apparent justifications for investigating Plaintiffs—stretching back decades and extending to individuals who may have passed through Plaintiff mosques, or participated in recreational or charitable activities, or attended the religious sermons or lectures of Plaintiff scholars and imams, *see* NYPD Letter 2–5—it would artificially and unfairly constrain the record before this Court if Defendants are permitted to withhold or redact this information.

Moreover, information in these documents about Defendants' scrutiny of other Muslim groups and individuals is necessary for Plaintiffs and the Court to properly understand the significance of Plaintiffs' inclusion in a particular document. For instance, if Plaintiffs Masjid Al-Ansar and Masjid At-Taqwa are listed with other individuals, mosques, or organizations that were *not* under NYPD investigation, that gives rise to an inference that any investigation of Plaintiffs was part of a broader program of unwarranted surveillance of Muslims, as opposed to

6

any legitimate investigation supported by a criminal predicate.[3]  Defendants decision to discuss or describe Plaintiffs within a specific document reflects their judgment that Plaintiffs were relevant to both the overall subject-matter and the other individual elements of that document. Plaintiffs are now entitled to examine the reason and basis for that judgment.

2.   <u>Documents concerning Defendants' discriminatory purpose and policy</u>

      a.   *Intelligence Division strategy and policy documents*

Plaintiffs' evidence will undoubtedly include specific Intelligence Division documents concerning Plaintiffs—but those are not the only materials relevant to Defendants' intent or discriminatory purpose. Plaintiffs allege, with substantial support, that their treatment by the NYPD stems from their status as *Muslim* New Yorkers. Thus, also relevant are NYPD strategy and policy documents that do *not* mention Plaintiffs specifically but demonstrate the Intelligence Division's own articulated basis for surveillance and investigation of Muslims generally. These materials go to the core of the discriminatory classification scheme that Plaintiffs allege. In

---

[3] The publicly available documents show that this concern is not merely theoretical. The NYPD's *Intelligence Report: Debriefing Initiative* describes the Intelligence Division's goal of recruiting an Arabic-speaking female informant with a "Salafi" background to establish a "listening post in the women's section of the [Plaintiff] Al Ansar mosque." NYPD Intelligence Division, *Intelligence Report: Debriefing Initiative* at 3, http://apne.ws/18Y7xlv (attached as Toomey Decl., Ex. C). The remainder of this document shows that the NYPD sought to place informants at organizations that may not have been under any formal investigation, such as the Arab American Association of New York. In its entirety, the document is evidence that supports Plaintiffs' argument that the NYPD had an expressly discriminatory policy, and that Plaintiffs were subject to illegitimate investigative techniques *pursuant to this policy*. Yet if the Court were to limit discovery to explicit references to Plaintiffs, even within relevant documents, the NYPD would be permitted to redact nearly all of this document. In so doing the Court would, in effect, permit the NYPD to hide behind redactions of information showing its overreach in investigating Muslims in general and Plaintiffs in particular. *Cf.* Adam Goldman & Matt Apuzzo, *Informant: NYPD Paid Me to 'Bait' Muslims*, Assoc. Press, Oct. 23, 2012, http://bit.ly/1bSo1ye (a former informant's account "shows how the NYPD unleashed informants on Muslim neighborhoods, often without specific targets or criminal leads") (attached as Toomey Decl., Ex. D).

particular, they will show the ways in which the NYPD deemed Muslim faith relevant to its surveillance and intelligence-gathering activities—facts that must be weighed in assessing the NYPD's investigations of Plaintiffs.

The relevance of these materials is closely tied to Plaintiffs' legal claims. Plaintiffs may show that the NYPD's targeting of Muslims violates the Equal Protection Clause in two ways: it is an express classification based on religion that does not survive strict scrutiny; and further, should the Court consider the NYPD's surveillance policy "neutral," Plaintiffs would show that Defendants have applied the policy in an intentionally discriminatory manner, with discriminatory effects. *See, e.g.*, *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996); *see also Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338-39 (1987) (noting that laws discriminating among religions are subject to strict scrutiny in the analysis of an equal protection claim).

To establish a violation by way of the first equal protection theory, discovery into Intelligence Division strategy documents, policy statements, reports, assessments, presentations, training materials, and operational directives is essential in order to understand the scope of the policy and the ways in which the NYPD identified Muslims for targeting. *See, e.g.*, *Floyd*, 2013 WL 4046209, at *73 ("When an officer is directed to target 'male blacks 14 to 21' for stops *in general* based on local crime suspect data . . . the reference to 'blacks' is an express racial classification subject to strict scrutiny."). These documents will also inform the Court's strict scrutiny analysis. In determining whether a particular measure is narrowly tailored, courts consider factors such as the need for the measure, the efficacy of alternative measures, and the

flexibility and duration of the measure. *See, e.g.*, *Patrolmen's Benevolent Assoc. of the City of N.Y. v. City of N.Y.*, 310 F.3d 43, 53 (2d Cir. 2002).

Strategy and policy materials also bear on Plaintiffs' second equal protection theory. Plaintiffs need not show, as an initial matter, that Defendants were motivated "solely, primarily, or even predominantly" by religion; rather, Plaintiffs "need begin only by showing that [religion] was '*a* motivating factor.'" *United States v. City of Yonkers*, 96 F.3d 600, 611–12 (2d Cir. 1996) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (emphasis in *City of Yonkers*)). The burden then shifts to Defendants to show that they would have engaged in the same surveillance and investigatory practices even without consideration of religion. *Id.* at 612. In order to prove that religion played a motivating role in Defendants' surveillance of Plaintiffs, strategy documents, policy statements, and operational directives will be critical to establishing the contours of Defendants' policy.

The significance of these materials is apparent, for example, in the NYPD's 2007 Radicalization Report. Although this document nowhere mentions Plaintiffs, it reflects the conceptual underpinnings of the Muslim Surveillance Program. *See* Mitchell D. Silber & Arvin Bhatt, Senior Intelligence Analysts, NYPD Intelligence Division, *Radicalization in the West: The Homegrown Threat* (2007), http://on.nyc.gov/17PI53J. Among other things, the report outlines the expansive scope of what the NYPD perceives as threatening behavior or identity. It provides insight into the NYPD's mapping of Muslim communities, stating that "[e]nclaves of ethnic populations that are largely Muslim often serve as 'ideological sanctuaries for the seeds of radical thought.'" *Id.* at 24. And it posits a profile of potential terrorist "candidates" so broad that it is no profile at all: within these Muslim "enclaves," potential terrorists could range from

members of middle-class families to "successful college students, the unemployed, the second and third generation, new immigrants, petty criminals, and prison parolees." *Id.* Commonplace activities for Muslim-Americans, like wearing Islamic clothing, growing a beard, abstaining from alcohol, and "[b]ecoming involved in social activism and community issues" are all listed as potential indicators of radicalization. *Id.* at 33. In short, the Radicalization Report is precisely the type of document that would inform the Court's understanding of Defendants' motivations when investigating Plaintiffs.[4]

     b.    *Surveillance and investigations of other Muslims*

Discovery into the Intelligence Division's surveillance and investigation of other Muslims is also essential to Plaintiffs' claims. This discovery is important not because it establishes a pattern or practice for *Monell* purposes at present, but because it allows the Court to judge the influence and strength of religion as a factor in the investigation of *these* Plaintiffs. If other Muslims were broadly subject to the same types of invasive techniques and protracted investigation, that proof supports Plaintiffs' argument that bias—not criminal suspicion—was at work in any NYPD investigation of them. This evidence promises to help the Court distinguish between those investigative techniques that were truly tailored to Plaintiffs, as Defendants might claim, and those that the NYPD applied to Muslims writ large.

---

[4] Similarly, Intelligence Division documents already in the public domain indicate that Muslim beliefs, identity, and practice have been defining factors in the NYPD Intelligence Division's surveillance and intelligence activities. For example, as the NYPD's 2006 Strategic Posture report shows, the Demographics Unit primarily mapped Muslims individuals and organizations, and identified Plaintiff Masjid At-Taqwa, among other community institutions, for heightened police scrutiny. *See* NYPD Intelligence Division, *Strategic Posture 2006* at 6–8, 53, 54, 77, 85, http://bit.ly/1eEuSNV (attached as Toomey Decl., Ex. E). Plaintiffs seek similar documents, including policy and strategy statements, describing the NYPD's interest in Muslim individuals, businesses, schools, organizations, and places of worship.

For this reason, Plaintiffs seek NYPD investigative statements, DD5s or field reports, daily activity reports, intelligence notes, surveillance requests, and intelligence briefings concerning Muslim individuals and organizations. These documents set an important baseline, demonstrating the duration, scope, and intensity of the NYPD's surveillance of Muslims in general, so that the Court can properly analyze the NYPD's surveillance of Plaintiffs in particular. In short, these materials are crucial corroborating evidence of Plaintiffs' discrimination theory: if other Muslims experienced similar treatment, it is a telltale sign that religion played a motivating role in the NYPD's investigation of Plaintiffs, rather than any retroactive justification Defendants now proffer to the Court.

For example, publicly available documents show that Plaintiff Elshinawy was subject to NYPD surveillance because the NYPD defined his religious views as "Salafi" and determined that he was "so highly regarded by so many young and impressionable individuals." *See, e.g.*, Technical Operations Unit Surveillance Request (Nov. 7, 2008), http://apne.ws/15fau4D (attached as Toomey Decl., Ex. F). Defendants may counter that Plaintiff Elshinawy was a target of surveillance because of the law enforcement interest in other targets who attended his lectures. The discovery that Plaintiffs seek into investigations of other Muslims would help to resolve these competing views. It would permit Plaintiffs to show that (1) Defendants engaged in a widespread program of surveillance involving police scrutiny of Muslims perceived by the NYPD to be influential in their community or believing in a particular school of religious thought (as defined by the NYPD); and (2) Defendants' surveillance of Plaintiff Elshinawy was motivated in whole or in part by this impermissible policy. By contrast, if the Court has before it only the NYPD's assertions, divorced from the treatment of Muslims more generally, it will be

11

unable to discern the extent to which a particular investigation was motivated by impermissible factors.

Numerous other NYPD documents in the public record reinforce this concern. For example, in an October 2006 Intelligence Note, a unit of the Intelligence Division compiled reports from confidential informants or undercover officers documenting reactions within five mosques to a plane crash that the NYPD knew had not been caused by terrorism. *See* NYPD Intelligence Division, Intelligence Analysis Unit, *Intelligence Note* (Oct. 16, 2006), http://apne.ws/16arHNb (attached as Toomey Decl., Ex. G). Specifically, Assistant Imam Adam at Masjid At-Taqwa is described as "agitated after hearing news of crash." With reference to "discussions with CI [confidential informant] about the possibility of another attack," Assistant Imam Adam is described as saying he was "not aware that something might happen." The Intelligence Note nevertheless states that a "Phone dump will be conducted on subject's phone for that day and time period." As Plaintiffs describe in their Complaint, Assistant Imam Adam recalls being concerned about the attack and fearful that blame would be ascribed to Muslims, or that there might be a hate crime against Muslims. *See* Compl. ¶ 129. If discovery were cabined to policy documents and express references to Plaintiffs, the Court would not know that the NYPD had also recorded innocent statements of shock and regret at four other mosques. It would have no basis for questioning whether the NYPD had subjected all five mosques to a related investigation, or whether the report reflects a widespread practice of recording congregants' innocent statements. As this example shows, discovery into the NYPD's surveillance of other Muslims will assist the Court in understanding the NYPD's surveillance policy and its

discriminatory application. Only then can the Court properly assess Plaintiffs' constitutional claims.[5]

     c.    *Surveillance and investigations of non-Muslim religious activities*

Finally, Plaintiffs are entitled to evidence showing how the Intelligence Division surveilled or investigated the religious speech, beliefs, and activities of *non*-Muslims—or not. This is classic comparator evidence: by setting the two groups side-by-side, the Court can assess the role of Muslim identity in fixing the scope, duration, and intensity of NYPD scrutiny. Although Plaintiffs "need not allege or establish the disparate treatment of otherwise similarly situated" non-Muslims, *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001), documents showing the NYPD's treatment of non-Muslims would provide important evidence of Defendants' discriminatory intent, as well as the discriminatory effects of the surveillance policy.

This discovery will support Plaintiffs' argument that the NYPD has discriminated *among* religions in violation of the Religion Clauses of the First Amendment, as well as the Equal Protection Clause. An understanding of how, in the course of its activities, the NYPD describes, weighs, or considers non-Muslim religious belief or practice will enable the Court to understand how the NYPD has treated Muslims differently, and how this discriminatory approach to Muslim faith and practice has affected Plaintiffs in particular. For example, if the NYPD's investigations into and surveillance of a Jewish organization or a Christian anti-abortion group suspected of criminal activity are not of a duration, scope, intensity, or frequency that is comparable to the

---

[5] *See also* NYPD Intelligence Division, *Deputy Commissioner's Briefing* (Apr. 25, 2008), http://apne.ws/17MdnHI (NYPD document demonstrating that sub-unit instructed "sources" to be "alert to any rhetoric re: the Sean Bell verdict" at several "convert" mosques, including Plaintiff Masjid At-Taqwa, without discussion of any particularized suspicion) (attached as Toomey Decl., Ex. H).

NYPD's investigations and surveillance of Muslims, this is plain evidence of both discriminatory purpose and effect.

Significantly, in the interests of limiting the scope of discovery at this stage, Plaintiffs are not requesting documents concerning the investigation or surveillance of secular organizations. Plaintiffs have also limited request for documents describing the surveillance and investigation of individuals to records concerning religious speech, beliefs, and practices. Plaintiffs have done so because this subset affords the most direct comparison while also narrowing the breadth of this request considerably.

       d.    *Statistics*

Finally, because statistics enable the types of comparison described above, Plaintiffs seek data that will allow the Court to compare the NYPD's investigation of Muslim individuals and organizations with those of their secular and non-Muslim religious counterparts. Such statistics will show, in a condensed form, the extent to which the NYPD's surveillance program is applied in a discriminatory manner.

## II.    Plaintiffs' Irreparable Injury and Motion for a Preliminary Injunction

Plaintiffs seek expedited discovery in support of a preliminary injunction that will protect them from irreparable injury pending final judgment in this litigation. As set out in their Complaint, Plaintiffs have experienced substantial and wide-ranging injuries as a result of the NYPD's discriminatory surveillance of Muslims. *See, e.g.*, Compl. ¶¶ 5, 45–133, 148–60.

In the time since Plaintiffs filed their Complaint, these ongoing harms have grown significantly more acute. On September 9, 2013, Defendants answered Plaintiffs' Complaint. One day later, on September 10, 2013, Defendants sent a letter to Magistrate Judge Azrack (Dkt.

No. 11), which was presented as a discovery request but made individual accusations against each of the Plaintiffs—relying on nothing more than the assertions of counsel. *See* NYPD Letter 1–5. Defendants' letter is rife with factual errors. It also attempts to defend the NYPD's surveillance of Plaintiffs on the basis of innuendo, guilt-by-association, and decades-old allegations. These statements evidence, even more plainly than before, Defendants' ongoing use of religious belief and association to justify open-ended surveillance of Plaintiffs. *See also* Adam Goldman & Matt Apuzzo, *NYPD Designates Mosques as Terrorism Organizations*, Aug. 28, 2013, http://bit.ly/15iOA9J (attached as Toomey Decl., Ex. I) (reporting that the NYPD designated entire mosques as "terrorism enterprises" for extended periods).

The consequences of Defendants' September 10 letter are twofold: Plaintiffs' justifiable fear of discriminatory NYPD surveillance has grown substantially, as has the stigmatizing effect of this surveillance on Plaintiffs within their communities. In particular, Defendants' unsupported statements to this Court demonstrate that, to this day, Plaintiffs remain under a heavy cloud of police scrutiny and suspicion because of their religious beliefs, associations, and activities. These statements have revealed that Defendants' religious profiling of Plaintiffs continues unabated, is wider in scope than previously known, and reaches even more deeply into Plaintiffs' daily religious life. In sum, Defendants' September 10 letter has made plain to Plaintiffs the need for this Court's urgent intervention.

Defendants' attempts to justify their monitoring of Plaintiffs demonstrate the significant role and impact of religious profiling in Defendants' investigations, in at least the following ways:

1.    <u>Improper Reliance on Decades-Old Allegations and Factual Inaccuracies</u>. The NYPD's program of surveillance and investigation of Muslims, including Plaintiffs, is longer in duration and wider in scope than the investigation of comparable secular targets or targets belonging to any other religious faith. Muslim faith, in other words, is used to justify disproportionate and potentially indefinite police scrutiny, relying in some instances on stale allegations and innuendo dating back twenty years or more.

        For example, Plaintiffs will show that Defendants' efforts to justify their surveillance of Plaintiff Masjid At-Taqwa, a mosque in Brooklyn, include spurious and inaccurate accusations about innocent and lawful activities dating as far back as the 1980s and 90s. Defendants omit this key detail from their claims. Even if decades-old accusations and insinuation about innocuous activity could somehow justify the surveillance described in the Complaint (and Plaintiffs do not concede that they could), Plaintiffs will show that, in fact, during the time in question, the area surrounding the mosque was plagued by drug-related violence and that the mosque's security team worked closely with the NYPD to provide security to congregants and individuals in the vicinity of the mosque. Indeed, the Masjid At-Taqwa community received a commendation from Mayor Giuliani for its efforts to make the neighborhood safer by sponsoring a "Life is Sacred, Stop the Violence" symposium that was "geared toward young adults and teaches them non-violent solutions to problems." *See* Office of the Mayor, City of New York, *Proclamation* (attached as Toomey Decl., Ex. J).

2.    <u>Improper Reliance on Religious Association</u>. The NYPD treats the religious association of Muslims—including the identity of attendees at religious services and lectures—as grounds for suspicion and investigation. Thus, religious leaders and even entire mosques are subject to

16

police scrutiny because the NYPD may have an interest in individuals who periodically attend services. It is as if the NYPD claims that it is entitled to infiltrate a Roman Catholic church and surveil its priests because the subject of an investigation attended mass there on Sundays.

For example, the NYPD attempts to defend its surveillance of Plaintiff Masjid Al-Ansar and Plaintiff Imam Raza by pointing to individuals who attended lectures at the mosque, as if the identity of a person who passes through the doors of a house of worship justifies the investigation of an entire religious institution and its congregation. Indeed, media reports indicate that the NYPD designated at least a dozen mosques "terrorist enterprises," in order to circumvent internal rules restricting the use of informants and other intrusive surveillance techniques in the absence of any evidence of criminal wrongdoing. *See* Adam Goldman & Matt Apuzzo, *NYPD Designates Mosques as Terrorism Organizations*, Aug. 28, 2013, http://bit.ly/15iOA9J (attached as Toomey Decl., Ex. I).

3.      Improper Surveillance of Community Activities. The NYPD's investigations of Muslims, including Plaintiffs, treat recreational activities as grounds for suspicion and as a legitimate subject of surveillance, where other secular or religious groups or their members do not face such scrutiny.

For example, the NYPD characterizes camping trips and paintball outings organized by Plaintiff Elshinawy—innocent activities that millions of Americans, including countless Boy Scouts, participate in every year—as suspicious in their own right because some of the participants happen to be Muslims. The round-the-clock police surveillance of these activities and others extended even to Plaintiff Elshinawy's wedding, where police videotaped every person who came and went and an informant audio recorded the ceremony itself. *See id.*

Together, Defendants' statements have heightened the ongoing injury to Plaintiffs, including the injuries specifically set out in their Complaint. *See* Compl. ¶¶ 5, 45–76, 77–112, 113–33, 148–60. In light of these injuries, Defendants' recent statements:

a. Add to and exacerbate Plaintiffs' fear that the NYPD continues to scrutinize Plaintiffs' religious belief and expression, which Defendants distort and mischaracterize in order to justify further criminal investigation;

b. Add to and exacerbate Plaintiffs' fear that the NYPD uses their religious associations, such as the attendees at their religious services or lectures, in order to justify open-ended surveillance and criminal investigation;

c. Show the extent to which the NYPD has kept wide-ranging records of Plaintiffs' religious beliefs and activities far into the past, which it uses to justify criminal investigation and surveillance in the present; and

d. Make plain that Defendants continue to treat Plaintiffs' protected religious activities and associations as a proxy for criminal suspicion, subjecting Muslims to a level of surveillance and infiltration that is not directed at members of the public at large or other religious groups.

In order to halt these irreparable and ongoing injuries, Plaintiffs intend to file a motion for a preliminary injunction that, pending final judgment, (i) orders the NYPD to segregate all existing records related to Plaintiffs' religious identity, speech, beliefs, and practices that are not supported by any individualized suspicion of Plaintiffs' wrongdoing, and prohibits any use or dissemination of such records; and (ii) enjoins the NYPD from any investigation of Plaintiffs that is based solely or predominantly on their religion.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Expedited Discovery in anticipation of their motion for a preliminary injunction.

Dated: October 8, 2013                     Respectfully submitted,
New York, New York

    */s/ Hina Shamsi*
Hina Shamsi (HS-6908)
Nusrat J. Choudhury (NC-2676)
Patrick Toomey (PT-4354)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
hshamsi@aclu.org

Ramzi Kassem (RK-3567)
Diala Shamas (DS-4123)
CLEAR project
Main Street Legal Services, Inc.
CUNY School of Law
2 Court Square
Long Island City, NY 11101
T: 718.340.4558
F: 718.340.4478
ramzi.kassem@law.cuny.edu

Arthur N. Eisenberg (AE-2012)
Mariko Hirose (MH-0313)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
T: 212.607.3300
F: 212.607.3318
aeisenberg@nyclu.org