UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAMID HASSAN RAZA; MASJID AL-ANSAR; ASAD DANDIA; MUSLIMS GIVING BACK; MASJID AT-TAQWA; MOHAMMAD ELSHINAWY,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF NEW YORK; MICHAEL R. BLOOMBERG, in his official capacity as Mayor of the City of New York; RAYMOND W. KELLY, in his official capacity as Police Commissioner for the City of New York; DAVID COHEN, in his official capacity as Deputy Commissioner of Intelligence for the City of New York,<br><br>Defendants. | No. 13-cv-03448-PKC-JMA<br><br>Hon. Judge Pamela Chen |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR EXPEDITED DISCOVERY**

Defendants' opposition to Plaintiffs' discovery motion is premised on a misunderstanding of equal protection doctrine, a premature and over-broad invocation of the law enforcement privilege, and exaggerated claims of the burden discovery would impose. Their proposal for bifurcated discovery gets equal protection law exactly backwards, and would improperly constrain Plaintiffs from establishing—and this Court from adjudicating—the basis for Plaintiffs' constitutional claims: Defendants' surveillance and investigation of Plaintiffs is based on Defendants' discriminatory use of religion, which is obviously a suspect classification.

Bifurcation of discovery to accommodate Defendants' *intent* to invoke the law enforcement privilege would also be squarely contrary to Second Circuit precedent holding that the privilege may only be invoked with respect to specific documents. Nor would Plaintiffs' cabined discovery requests unduly burden Defendants beyond the burden imposed on every litigant—including the NYPD in other cases.

At the heart of Defendants' opposition to Plaintiffs' request for discovery is Defendants' shocking premise that crimes committed by a few Muslims justify police surveillance of Plaintiffs and the Muslim communities of which they are a part. But that argument simply reinforces the need for this lawsuit. Indeed, in Defendants' opposition and accompanying declaration from the head of the NYPD Intelligence Bureau, they virtually admit that the Intelligence Bureau's surveillance of Plaintiffs and others stems from discriminatory policing. Thus, while Defendants protest that their "radicalization" theory is not an "operational guide," the theory's biased assumptions about Muslims color many pages of the opposition brief, as they do hundreds of pages of internal NYPD documents already in the public record.[1]

Defendants' rationale would never be tolerated if it were invoked for members of another group. For example, it is difficult to imagine Defendants justifying mass surveillance and investigation of white men aged 16 to 22 because of the "mass murder purpose of plots perpetrated" by deranged shooters who are most often young white males.[2]

The discriminatory surveillance and investigations at issue here are no less unjustified and unconstitutional. Plaintiffs are entitled to the discovery they seek.

**I.      Plaintiffs Are Entitled to Records Showing Defendants' Use of Religion as a Suspect Classification.**

---

[1] Decl. of David Cohen in Supp. of Defs.' Opp'n to Pls.' Mot. for Expedited Disc. ("Cohen Decl.") ¶ 24, ECF No. 25.

[2] *Id.* ¶ 15.

2

Defendants' opposition is based on a faulty premise. They argue that the only information "legally or logically relevant to plaintiffs' claims is the information about these plaintiffs." Defs.' Opp'n 8. They are wrong on both accounts—law and logic. Defendants ignore basic principles of equal protection law in their effort to keep from Plaintiffs and the Court key evidence of discriminatory purpose. Bifurcation may be appropriate "where the evidence offered on two different issues will be wholly distinct, or where litigation of one issue may obviate the need to try another issue." *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (internal citations omitted). Neither justification for bifurcation applies here.

First, Defendants' policies and practices are inextricably intertwined with the constitutional violations that Plaintiffs allege. Plaintiffs assert—with considerable factual support—discrimination based on a protected classification. If Defendants have policies concerning the investigation of New York Muslims, the class of citizens to which Plaintiffs belong, those policies are plainly relevant to the NYPD's investigations of Plaintiffs specifically. They are part and parcel of the intent analysis. Defendants barely contest this point. *See* Defs.' Opp'n 6 n.6. The same holds true of any unwritten NYPD practice of singling out Muslims for heightened scrutiny—it will tell the Court a great deal about the NYPD's interest in surveilling these New York Muslims. *See, e.g.*, *Lineen v. Metcalf & Eddy, Inc.*, No. 96-cv-2718, 1997 WL 73763, at *6 (S.D.N.Y. Feb. 21, 1997) (rejecting bifurcation in discrimination case).

Second, Defendants' bifurcation proposal depends on a fundamental misunderstanding of equal protection doctrine: they assume that Plaintiffs' constitutional claims would fail if the NYPD had *some* basis for investigating Plaintiffs. *See, e.g.*, Defs.' Opp'n 8. This is wrong as a matter of substantive law, as well as fact, and it shows why Defendants' proposal is the improper procedure for evaluating the parties' competing claims. Cases involving multiple motives are the

paradigmatic example: the presence of some legitimate motive does not automatically negate or excuse another, unlawful motive. Having alleged discrimination, Plaintiffs are entitled to show that Defendants' investigations of them were motivated in whole or in substantial part by their Muslim faith. *See, e.g.*, *United States v. City of Yonkers*, 96 F.3d 600, 611–12 (2d Cir. 1996).

A. **Evidence of discriminatory purpose is directly relevant to Plaintiffs' constitutional claims.**

Plaintiffs have pled two alternate equal protection theories, both of which justify discovery showing Defendants' discrimination on the basis of religion.[3] First, Plaintiffs assert that the NYPD adopted, as a policy, an "express classification" that singled out Muslims for heightened police scrutiny. Compl. ¶¶ 1, 3, 6. Second, even if the Court deems the NYPD's surveillance policy "neutral," Plaintiffs assert that Defendants applied the policy in an intentionally discriminatory manner. *See, e.g.*, Compl. ¶¶ 1, 3, 6, 161 (describing Defendants' "policy *and practice*" of discriminating against Muslims (emphasis added)); *Pyke v. Cuomo*, 258 F.3d 107, 109–10 (2d Cir. 2001) (describing "discriminatory application" theory). Significantly, neither theory requires Plaintiffs to establish the existence of similarly situated individuals or groups. *See, e.g.*, *Pyke*, 258 F.3d at 109–10.[4] Both theories, however, put evidence of Defendants' discriminatory purpose squarely at issue.

---

[3] Plaintiffs also state First Amendment claims entitling them to this discovery, *see* Pls.' Br. 3 & n.1, 8, but Defendants do not address those claims in their opposition.

[4] Contrary to Defendants' description, Plaintiffs have not put forward a "selective enforcement" or "selective prosecution" claim. *See* Defs.' Opp'n 10. Defendants incorrectly assume that Plaintiffs' "discriminatory application" theory under *Pyke*, 258 F.3d at 109–10, is identical to a selective enforcement theory. *See* Defs.' Opp'n 10. Yet the case law could not be clearer: these are separate equal protection theories, and Plaintiffs are not *required* to identify a group of similarly situated individuals to prevail. *See, e.g.*, *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543–45, 554–58 (S.D.N.Y. 2006) (explaining differences); *Savino v. Town of Southeast*, No. 11-cv-483, 2013 WL 5730043, at *6–10 (S.D.N.Y. Oct. 21, 2013).

**B.     Bifurcation would improperly limit this Court's adjudication of Plaintiffs' constitutional claims.**

1. *Defendants cannot defeat Plaintiffs' discrimination claims simply by showing some basis for investigation.*

Defendants erroneously contend that if the NYPD had some legitimate basis for surveillance, this would "disprove[]" Plaintiffs' claims. Defs.' Opp'n 8. But even if the NYPD could show some basis for its investigation and surveillance of Plaintiffs, that would not be the end of the Court's constitutional analysis, for at least three reasons.

First, discriminatory purpose frequently exists alongside other motives. *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1223–24 (2d Cir. 1987); *Howard v. Senkowski*, 986 F.2d 24, 29–30 (2d Cir. 1993) (describing dual-motivation analysis). Thus, discriminatory purpose and reasonable suspicion are not mutually exclusive.[5] *See Floyd v. City of N.Y.*, __ F. Supp. 2d __, 2013 WL 4046209, at *75 (S.D.N.Y. Aug. 12, 2013) (rejecting "the unsupportable position that racial profiling cannot exist provided that a stop is based on reasonable suspicion").[6] Indeed, Defendants concede that religion need not be the "sole, primary, or

---

[5] Although Plaintiffs do not bring a "selective prosecution" claim, those cases provide a plain illustration of this point. They show, unmistakably, that an equal protection violation may be found based on discriminatory purpose, notwithstanding the presence of probable cause. *See Espinoza v. City of N.Y.*, No. 11 Civ. 2108, 2012 WL 4761565, at *5 (S.D.N.Y. Aug. 3, 2012); *Leather v. Eyck*, 180 F.3d 420, 424–26 (2d Cir. 1999) (permitting selective prosecution claim to proceed despite the plaintiff's conviction on the underlying charge). This same logic applies to Plaintiffs' claims that the NYPD's surveillance policy was applied in a discriminatory manner. The dispositive point here is that reasonable suspicion does not control the analysis of either Plaintiffs' Fourteenth *or* their First Amendment claims. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."); *cf. Tabbaa v. Chertoff*, 509 F.3d 89, 102 n.4 (2d Cir. 2007) ("[D]istinguishing between incidental and substantial burdens under the First Amendment requires a different analysis, applying different legal standards," than under the Fourth Amendment.).

[6] The cases cited by Defendants are not to the contrary. *See, e.g.*, *Pierre v. City of N.Y.*, No. 05-cv-5018, 2007 WL 2403573, at *14 (E.D.N.Y. Aug. 17, 2007) (rejecting racial discrimination claim where plaintiffs supplied "no evidence" supporting their allegations).

predominant factor" for Plaintiffs to establish their case and shift the burden to Defendants—it need only be a substantial or motivating factor in Defendants' decision-making. Defs.' Opp'n 14; *see, e.g.*, *City of Yonkers*, 96 F.3d 611–12. Second, the bare existence of some suspicion does not end the factual inquiry. Rather, the Court must determine the extent to which a discriminatory purpose affected the scope, intensity, and duration of the NYPD's investigations into Plaintiffs. *See* Pls.' Br. 5. Third, permitting discovery into Defendants' policies and practices will provide the Court with the context needed to assess the credibility of Defendants' justifications for their treatment of these Plaintiffs. *See, e.g.*, *Lineen*, 1997 WL 73763, at *6 (rejecting bifurcation as "highly inefficient" and "unfair" because it would preclude the plaintiff from exploring evidence supporting an inference of discriminatory animus).

In short, bifurcation is inappropriate because the equal protection analysis does not begin or end with Defendants' assertion of suspicion. Defendants, understandably, would prefer to put on their defense at the outset and in a vacuum—all before Plaintiffs obtain discovery into competing evidence about Defendants' motives. But that would get equal protection law exactly backwards. The Supreme Court has set out a two-step process that directly counters Defendants' proposal: it is Plaintiffs who are entitled to make their case, through discovery, at which point Defendants must convince the Court that they would have taken the same actions regardless of Plaintiffs' religion. *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

2. *Defendants all but concede that Plaintiffs are entitled to policy documents.*

Defendants' brief says tellingly little about Plaintiffs' request for policy and training documents, for good reason: these materials are indisputably relevant to Plaintiffs' constitutional claims. *See* Pls.' Br. 4, 7–10. Consistent with Plaintiffs' "express classification" theory, policy documents would show the directives and guidance applicable to the NYPD's investigation of Muslims as a group, which necessarily includes Plaintiffs. *See, e.g.*, Mitchell D. Silber & Arvin

6

Bhatt, Senior Intelligence Analysts, NYPD Intelligence Division, *Radicalization in the West: The Homegrown Threat* at 24, 33 (2007), http://on.nyc.gov/17PI53J. Similarly, under Plaintiffs' second equal protection theory, the Intelligence Bureau's policy and training documents are essential to establishing discrimination in the implementation of the NYPD's surveillance program. *See, e.g.*, NYPD Intelligence Division, *Strategic Posture 2006* at 6–8, 53, 54, 77, 85, http://bit.ly/1eEuSNV (Toomey Decl., Ex. E). In much the same way, these materials bolster Plaintiffs' First Amendment claims, by showing a broad intent to target one religious group.

Courts have rejected bifurcation for precisely the reasons these documents demonstrate. There is a close nexus between municipal policy directives and officials' conduct. *See Pavlovich v. City of N.Y.*, No. 91-cv-5030, 1992 WL 230472, at *3 (S.D.N.Y. Aug. 31, 1992) (pointing to the "close nexus between the conduct of an official on a given occasion and a municipal practice or policy"). Indeed, the NYPD's policies, guidance, and training materials all bear on the extent to which religion was an impermissible motivating factor in the NYPD's decisions to investigate Plaintiffs. *See Dean v. Harris Cnty.*, No. H-13-00073, 2013 WL 5214351, at *10 (S.D. Tex. Sept. 17, 2013) (rejecting bifurcation because the "individual defendants' knowledge and understanding of potential municipal policies may be relevant to the applicable culpable mental state for § 1983 liability"); *see also Warren v. Dart*, No. 09 C 3512, 2012 WL 1866372, at *3 (N.D. Ill. May 22, 2012) (rejecting bifurcation in *Monell* case where municipal policy was relevant to individual defendants' conduct).

    3. *Plaintiffs are entitled to discovery concerning the NYPD's surveillance of other Muslims.*

Defendants argue that their surveillance or investigation of other Muslims has no bearing on the existence of a constitutional injury in this case, *see* Defs.' Opp'n 6 n.6, but this evidence is in fact central to Plaintiffs' classification-based discrimination claims. *See* Pls.' Br. 10–13. If

7

other Muslims were subjected to heightened, prolonged, or unwarranted police scrutiny, it is powerful evidence that Plaintiffs' mistreatment was *not* the product of factors "unique" to each Plaintiff—but, instead, a product of their common religion. In short, this discovery is necessary for the Court to judge the influence of religion as a factor in the NYPD's investigation of Plaintiffs. *See Lineen*, 1997 WL 73763, at \*6. By contrast, if the Court has before it only documents referencing Plaintiffs, as Defendants would like, it will be far more difficult to know the extent to which a particular investigation was motivated by religious discrimination. *See, e.g.*, Pls.' Br. 11–12 (describing, based on available documents, how the NYPD's surveillance of other Muslims would provide critical context for its surveillance of Plaintiff Elshinawy).

While individual investigations may differ to some degree, the ability to assess the NYPD's surveillance tactics across the class of Muslims is essential—and hardly impossible. Significant similarities may be found even where individual facts differ. *See, e.g.*, *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee." (emphasis in original)). For example, it is important for the Court to know whether the NYPD mapped *all* mosques or only Plaintiff mosques, because this illuminates the NYPD's underlying purpose: was the critical factor the mosques' religious identity or, instead, some specific interest. (Documents in the public domain suggest that the reality is much closer to "all mosques." *See Strategic Posture 2006* at 6–7.) Claims based on suspect classification inevitably raise the question of how individuals *other than the plaintiff* were treated, and Defendants' treatment of other Muslims is crucial context. It allows the Court to gauge the relative weight of Plaintiffs' religious faith in setting the duration, scope, and intensity of surveillance that Defendants claim was justified. Defendants must offer

8

more than their own say-so, by showing that their treatment of other Muslims differed from their treatment of Plaintiffs.[7] That is precisely the crux of this lawsuit.

> 4. *Plaintiffs are entitled to discovery of NYPD surveillance of non-Muslims based on their religion.*

Comparator evidence will show, too, that Plaintiffs have suffered a constitutional injury. While Plaintiffs are not *required* to identify similarly situated non-Muslims, *see Pyke*, 258 F.3d at 109, documents demonstrating the NYPD's surveillance (or not) of non-Muslims' religious activity will provide critical evidence of Defendants' discriminatory purpose. *See* Pls.' Br. 13.

Defendants argue that any attempt at comparison is "futile" because the threat from "Islamists radicalized to violence" is "unique." Defs.' Opp'n 11. This argument might fairly be taken as an admission of bias: Defendants appear to be saying that what they consider the "Islamist threat" is so great that it justifies sweeping, preemptive surveillance of innocent Muslims, unlike other religious groups. The argument is also simply wrong. First, the threats of violence come from a variety of sources, most having nothing to do with Islam. *See, e.g.*, Steve Coll, *What Is the Real Terrorist Threat in America?*, The New Yorker, Aug. 9, 2012, http://nyr.kr/172AP12; The New America Foundation, The Homegrown Threat: Homegrown Terrorism Cases, 2001–2013 (last visited Nov. 7, 2013), http://bit.ly/1bTlBOM; Press Release, National Consortium for the Study of Terrorism and Responses to Terrorism, University of Maryland, Far-Right Attacks on U.S. Law Enforcement, http://bit.ly/17cArCD (describing violence by right-wing extremists, including many who claim to be motivated by religion). If the

---

[7] Defendants' reliance on *McCleskey v. Kemp*, 481 U.S. 279, 292, 294–96 (1987), is misplaced. *See* Defs.' Opp'n at 5. *McCleskey* concerned the question of whether a statewide statistical study could, *by itself*, support a finding that the jury in the petitioner's case acted with discriminatory purpose when it imposed the death penalty. *See id.* at 294–96. The Supreme Court's analysis has no bearing on the scope of "relevance" here, where Plaintiffs seek discovery showing one police department's specific practice of investigating Muslims.

NYPD did not subject white supremacists who believe in a "radical" version of Christianity to the same treatment as Muslims, that itself is telling. Second, while every threat may be "different," equal protection doctrine does not require that a comparator be identical in order to be relevant. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (where "plaintiffs seek to draw inferences of discrimination," the circumstances surrounding a comparator "need not be identical"). Plaintiffs have calibrated their discovery request in precisely this way, seeking only those documents pertaining to the surveillance or investigation of non-Muslims based on their religious belief or activity. *See* Pls.' First Req. for Produc. of Docs., Schedule A ("Pls.' Schedule A") at 8, ECF No. 20-1. This discovery is designed to produce comparator evidence showing the role of Islam, relative to other faiths, in defining the scope, duration, and intensity of the NYPD's investigations. It will allow the Court to assess whether—as the opposition brief suggests—Defendants took the nature of one threat as a reason to treat Muslims differently from their Christian, Jewish, or other religious counterparts.

## II.     The Law Enforcement Privilege Does Not Justify Bifurcating Discovery.

Defendants argue that the Court should bifurcate discovery in order to avoid "unwarranted and premature law enforcement privilege disputes," Defs.' Opp'n 16, and that the Court should dramatically limit discovery at this stage as a result. *See id.* at 17, 19–20; Cohen Decl. ¶¶ 27–28. This argument fails.

First, the law enforcement privilege is a document-specific privilege; it does not apply to every piece of paper in the Intelligence Bureau's possession and it cannot be invoked in the abstract to bar Plaintiffs' discovery requests writ large, as Defendants seek to do here. Indeed, Defendants repeatedly point to the Second Circuit's decision in *In re City of N.Y.*, 607 F. 3d 923, 946 (2d Cir. 2010), while ignoring both the procedures and the facts set out in that case. As the Second Circuit held, "the party asserting the law enforcement privilege bears the burden of

10

showing that the privilege applies to the documents in question." *Id.* at 944. The court of appeals then conducted a *document-specific* review of the materials at issue. *See id.* at 946 & n.24; *see also SEC v. Chakrapani*, Nos. 09 Civ. 325, 09 Civ. 1042, 2010 WL 2605819, at *6 (S.D.N.Y. June 29, 2010). At present, there are no *documents* in question—only Plaintiffs' requests for relevant discovery.

While it may be Defendants' view that many of the responsive documents implicate the law enforcement privilege, Defendants have not even begun to identify those records. Their position is, at bottom, one that exaggerates the role and breadth of the privilege. Defendants give the impression that nearly every file belonging to the Intelligence Bureau is privileged. *See* Cohen Decl. ¶¶ 26–27. But that is demonstrably false. In *In re City of N.Y.* alone, the NYPD turned over 600 pages of "End User Reports" from the Intelligence Bureau's files without issue. *See* 607 F.3d at 930. That decision did not wall off the Intelligence Bureau from discovery requests as Defendants would have it. In reality, the application of the privilege is far more fine-grained, and many relevant documents may fall outside the privilege altogether. Indeed, Defendants have already put Intelligence Bureau documents into the public record in this case. *See, e.g.*, Cohen Decl., Ex. D. These disclosures show that Defendants are selectively setting before the Court only those Intelligence Bureau records supporting their theory, while seeking to shield the materials sought by Plaintiffs behind an expansive claim of privilege. But that represents an abuse of the privilege.

Second, contrary to Defendants' suggestion, courts are fully capable of applying the law enforcement privilege as it is designed to be used—with respect to specific documents. *See, e.g.*, *Pegoraro v. Marrero*, 281 F.R.D. 122, 131 (S.D.N.Y. 2012). Yet Defendants seek to preempt this process by barring Plaintiffs from even asking for relevant materials. As in any other case,

11

Plaintiffs should be permitted to request relevant evidence in the first instance, including evidence of NYPD policies and practices related to the investigation of Muslims like Plaintiffs. While Plaintiffs' need for these documents is compelling, as Plaintiffs explained above and previously, *see* Pls.' Br. 2–14, it is not their burden to make that showing at this stage. Under Federal Rule of Civil Procedure 26(b), they are entitled to seek evidence bearing on their well-pled claims of religious discrimination. Defendants may then respond with a privilege log, identifying the specific documents at issue and their asserted basis for withholding. With that log, the Court can properly assess (1) whether Defendants have satisfied their initial burden of showing that the privilege in fact applies to the particular documents in question; and (2) whether Plaintiffs' compelling need for the documents outweighs any public interest in their nondisclosure. *See In re City of N.Y.*, 607 F.3d at 944–45. When appropriate, the Court will be able to address certain subsets of these documents together for purposes of economy; but it will also have the information needed to gauge Defendants' blanket assertions, by examining the specific documents *in camera*, if necessary. As Plaintiffs proposed at oral argument, the Court can then adopt protective rules that balance the parties' concrete interests in the documents at issue.[8]

### III. Plaintiffs Satisfy the Standard for Expedited Discovery.

### A. Courts apply a "flexible standard" of reasonableness or good cause, which Plaintiffs readily meet.

Recent authority in this circuit overwhelmingly supports the application of a "reasonableness" or "good cause" standard to Plaintiffs' request for expedited discovery. *See,*

---

[8] Significantly, the Court will have to address the law enforcement privilege even if it accepts Defendants' proposal. At the pre-motion conference and in their opposition, Defendants have indicated their intent to invoke the privilege even with respect to documents naming Plaintiffs. *See* Defs. Opp'n 18 n.13; Defs.' Opp'n, Ex. A, Tr. of Conf., 41:5–41:11, ECF No. 24-1.

*e.g.*, *N.Y. v. Mountain Tobacco Co.*, No. 12-cv-6276, 2013 WL 3488262, at *6 (E.D.N.Y. July 11, 2013); *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007) (Chin, D.J.). These courts have expressly rejected the four-pronged test of *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982) urged by Defendants, because "employing a preliminary-injunction type analysis to determine entitlement to expedited discovery makes little sense, especially when applied to a request to expedite discovery in order to prepare for a preliminary injunction hearing." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326–27 (S.D.N.Y. 2005) (Lynch, D.J.).

Plaintiffs satisfy their burden—they have shown "good cause" and their request is reasonable "in light of all the surrounding circumstances." *Ayyash*, 233 F.R.D. at 327. Plaintiffs seek expedited discovery in support of preliminary relief to protect them from ongoing and irreparable harm to their religious practice and association. *See* Pls.' Br. 14–18; Pls.' Ltr. to Judge Chen, Sept. 12, 2013, at 2–3, ECF No. 13. These injuries continue to this day and have been heightened and exacerbated by Defendants' September 10 letter. *See* Pls.' Br. 2–14.

**B.** **Defendants grossly exaggerate the burden of complying with Plaintiffs' discovery request.**

Defendants are incorrect about the burden Plaintiffs' discovery request would impose. As an initial matter, Plaintiffs' request would not require "a review of every document" within the Intelligence Bureau. Defs.' Opp'n 2. Plaintiffs have limited their request to five categories of relevant records, as set out in their opening brief. *See* Pls.' Br. 6–14. They have further limited their request in time, notwithstanding the fact that the NYPD's discriminatory surveillance program stretches back to at least 2001. *See* Pls.' Schedule A at 8. Significantly, Plaintiffs also explicitly exclude units within the Intelligence Bureau likely to have little relation to the substance of this suit. *See* Pls.' Schedule A at 3 (excluding Gang Assessment and Narcotics Assessment units). Finally, Plaintiffs cabin their request concerning the NYPD's surveillance of

13

non-Muslims to the investigation of other groups' *religious* speech, beliefs, or activities. *See* Pls.' Br. 13–14. Unless Defendants are saying that almost all of their surveillance has been targeted at Muslims, which in itself would be telling, or at other religious identities, the material sought is presumably a fraction of the Intelligence Bureau's total work.

Defendants ignore the various limitations written into Plaintiffs' request, as well as the obvious reasons this discovery is manageable. In contrast to the serious harms that would result from a denial of expedited discovery—namely, prejudice to Plaintiffs' ability to secure preliminary relief—Defendants' burden consists largely of the hardship inherent to the discovery process. *See N. Atl. Operating Co. v. Evergreen Distribs., LLC*, No. 13-cv-4974, 2013 WL 5532749, at *6 (E.D.N.Y. Oct. 4, 2013) ("Discovery inherently places a burden on the responding party, but in this case, that hardship is outweighed by the harm that may result to Plaintiffs if their request is denied."). Perhaps most notably, Defendants protest that the NYPD does not "maintain or categorize documents by religion," as if that rendered the discovery request oppressive and overly burdensome. Defs.' Opp'n 2; *see id.* at 22. But a party's filing system does not limit what relevant evidence an opposing party may ask for. Rarely do one party's discovery requests map onto its adversary's filing system. Just as importantly, it is surely not the case that the NYPD must examine every document one-by-one in order to conclude that certain materials fall outside of Plaintiffs' discovery request—*i.e.*, that they do not pertain to religious speech, beliefs, or activities.

Moreover, this review can readily be streamlined further. As is standard practice in litigation today, Defendants can use an agreed-upon set of keywords to search their electronic files and databases for responsive materials.[9] It is clear from previously disclosed documents that

---

[9] NYPD documents already in the public domain suggest that such keywords might include:

14

many of the Intelligence Bureau's records were generated electronically, meaning that they are amenable to keyword searching. *See, e.g.*, *Deputy Commissioner's Briefing* (Apr. 25, 2009), http://apne.ws/17MdnHI (Toomey Decl., Ex. H). This fact alone dramatically undercuts Defendants' claim that responding to Plaintiffs' discovery request is all but impossible.

In addition, Defendants' contention that production is "not feasible" within the proposed time frame does not foreclose an expedited schedule. The parties can work with the Court to agree on a reasonable schedule that would preserve Plaintiffs' interest in moving for a preliminary injunction as soon as possible. It may be that "defense counsel will have to work harder and quicker" on an expedited schedule, but this factor is not sufficient to establish unfair prejudice. *Stern*, 246 F.R.D. at 458.

Finally, Defendants mischaracterize Plaintiffs' discovery request, even as they make the incredible argument that complying with discovery would impair the NYPD's "ability to prevent another terrorist attack." Defs.' Opp'n 4. Defendants regularly respond to discovery requests without endangering public safety, jeopardizing ongoing investigations, or impairing the privacy interests of others. *See* Defs.' Opp'n 18, 22. Each of these concerns can be accommodated through ordinary discovery mechanisms at the Court's disposal. They are not a basis for depriving Plaintiffs of documents that would squarely support their claims of discrimination.[10]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Expedited Discovery in anticipation of their motion for a preliminary injunction.

---

"Muslim," "Salafi," "mosque," "rhetoric of concern," "Coptic," "Jew," etc.

[10] The case law cited by Defendants is not to the contrary. *See, e.g., Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 402 (S.D.N.Y. 2011) (rejecting request where the plaintiff offered "no concrete basis whatsoever" to justify expedited discovery). Even if *Notaro*, 95 F.R.D. at 405, applied to this motion, Plaintiffs have satisfied that test as well. *See, e.g.*, Pls.' Br. 14–18; Pls.' Ltr. to Judge Chen, Sept. 12, 2013; Pls.' Br. 6–14.

Dated: November 7, 2013
New York, New York

Respectfully submitted,

*/s/ Hina Shamsi*
Hina Shamsi (HS-6908)
Patrick Toomey (PT-4354)
Ashley Gorski (AG-1027)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
hshamsi@aclu.org

Ramzi Kassem (RK-3567)
Diala Shamas (DS-4123)
*Supervising Attorneys*
Michelle Born
Benjamin Lunsford
*Student Attorneys*
CLEAR project
Main Street Legal Services, Inc.
   CUNY School of Law
2 Court Square
Long Island City, NY 11101
T: 718.340.4558
F: 718.340.4478
ramzi.kassem@law.cuny.edu

Arthur N. Eisenberg (AE-2012)
Mariko Hirose (MH-0313)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
T: 212.607.3300
F: 212.607.3318
aeisenberg@nyclu.org