UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

HAMID HASSAN RAZA, MASJID AL-ANSAR;
ASAD DANDIA; MUSLIMS GIVING BACK;
MASJID AT-TAQWA; and MOHAMMAD
ELSHINAWY,

                 Plaintiffs,

         v.

CITY OF NEW YORK; MICHAEL R. BLOOMBERG,
in his official capacity as Mayor of the City of New
York; RAYMOND W. KELLY, in his official capacity
as Police Commissioner for the City of New York; and
DAVID COHEN, in his official capacity as Deputy
Commissioner of Intelligence for the City of New York,

                 Defendants.

----------------------------------------------------------------x

**MEMORANDUM & ORDER**
13-CV-3448 (PKC) (JMA)

PAMELA K. CHEN, United States District Judge:

       Plaintiffs move for expedited discovery in support of an anticipated motion for a preliminary injunction.  (Dkt. 20.)  For the reasons set forth herein, Plaintiffs' motion is GRANTED, in part, and DENIED, in part, as follows: (1) Plaintiffs' Document Request #1 is granted, except with respect to potential redactions by Defendants; (2) Plaintiffs' Document Request #2 is granted to the extent that the investigations referenced therein relate to Plaintiffs; (3) Plaintiffs' Document Request #3 is granted, with modifications; (4) Plaintiffs' Request # 4 is granted, with modifications; (5) Plaintiffs' Requests #5 through #9 are denied in their entirety; and (6) Plaintiffs' sole interrogatory, which contains three subparts, is granted.  In addition, Plaintiffs' request for expedited discovery, pursuant to their proposed schedule, is DENIED.  The

schedule that will govern the discovery permitted herein is set forth at the conclusion of this Memorandum and Order.

## BACKGROUND

Plaintiffs are three Muslim individuals, two mosques, and a non-profit Muslim organization.  They allege that Defendants have violated, and continue to violate, their constitutional rights through unlawful, "suspicionless" surveillance and investigation conducted by the New York Police Department ("NYPD") pursuant to its purported "Muslim surveillance program."  (Dkt. 1 at 1.)  Plaintiffs' complaint sets forth four causes of action: (1) violation of the Equal Protection Clause of the Fourteenth Amendment; (2) violation of the Free Exercise Clause of the First Amendment; (3) violation of the Establishment Clause of the First Amendment; and (4) violation of the right to freely exercise their religion under Article I § 3 of the New York State Constitution.  (Dkt. 1 at 30–32.)

On September 10, 2013, one day after filing their answer, Defendants submitted a request for bifurcated discovery to the Honorable Joan M. Azrack, with the first phase of discovery being limited to whether Plaintiffs have standing to sue and whether they have suffered a constitutional violation.  (Dkt. 11 at 2.)  According to Defendants, the second phase, to which the parties would proceed if Plaintiffs established standing and a constitutional violation, would concern "the NYPD's general investigative policies and practices."  (Dkt. 11 at 2.)  Defendants' motion for bifurcated discovery was principally based on the arguments that Plaintiffs would be unable to make either showing, and that non-bifurcated discovery would "open up innumerable discovery disputes regarding the law enforcement privilege and waste judicial resources."  (Dkt. 11 at 2.)  Defendants advised Judge Azrack that, at the conclusion of the initial phase of

bifurcated discovery, they would move to dismiss this action based on a lack of standing and the absence of any constitutional violation.  (Dkt. 11 at 5.)

On September 11, 2013, Plaintiffs filed a response in which they opposed Defendants' request for bifurcated discovery and informed Judge Azrack that Plaintiffs planned to seek leave to move for a preliminary injunction and for expedited discovery with respect to that motion. (Dkt. 12.)

On September 12, 2013, Plaintiffs filed a pre-motion conference request with this Court regarding the preliminary injunction motion and expedited discovery.  (Dkt. 13.)  Plaintiffs indicated that their motion would seek to have the Court: "(1) order the NYPD to segregate all existing records related to Plaintiffs' religious identity, speech, beliefs, and practices that are not supported by any individualized suspicion of Plaintiffs' wrongdoing, and prohibit any use or dissemination of such records; and (2) enjoin the NYPD from any investigation of Plaintiffs that is based solely or predominantly on their religion."  (Dkt. 13 at 2.)

On September 12, 2013, Judge Azrack held a conference with the parties regarding Defendants' request for bifurcated discovery.  (Dkts. 14, 15.)  Judge Azrack reserved judgment on the bifurcation issue, and directed the parties to confer in the meantime regarding a confidentiality agreement to govern the exchange of documents and information during discovery, to which the parties have not yet agreed.  (Dkt. 15 at 5–6; Dkt. 19.)

On September 19, 2013, Defendants submitted their opposition to Plaintiffs' request for a pre-motion conference on their proposed preliminary injunction motion and for expedited discovery.  (Dkt. 18.)

On October 7, 2013, the Court held a pre-motion conference, during which the Court heard argument from the parties regarding Plaintiffs' request for expedited discovery.  The Court

set a briefing schedule to permit Defendants to object to the Plaintiffs' proposed discovery requests.

The next day, October 8, Plaintiffs filed their motion for expedited discovery, including their proposed interrogatory and document requests.  (Dkt. 20.)  Defendants filed their opposition on October 30, 2013.  (Dkt. 23.)  Plaintiffs submitted their reply on November 7.  (Dkt. 27.)

Through their proposed expedited discovery requests, Plaintiffs seek a wide range of documents and information relating not only to the NYPD's surveillance and investigation of Plaintiffs, but the NYPD's investigative policies and activities relating to all Muslim individuals and organizations, and relating to all *non*-Muslim individuals and organizations, where the policy or activity is or was based on the individual's or organization's religious speech, beliefs, practices, and activities.  (Dkts. 20-1, 20-2.)

Defendants' response, while not addressing Plaintiffs' motion on a request-by-request basis, broadly interposes objections based on lack of relevance, overbreadth, and undue burden.  (Dkt. 23 at 1–3.)  Defendants also emphasize the heightened law enforcement sensitivity of the information being sought by Plaintiffs.  (*E.g.*, Dkt. 23 at 1.)  In addition, Defendants argue that Plaintiffs have failed to meet the standard justifying expedited discovery.  (Dkt. 23 at 21.)

*DISCUSSION*

I.   Standard for Expedited Discovery

The management of discovery, including the timing and scope of discovery, lies within the sound discretion of the Court.  *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003) ("the federal rules give district courts broad discretion to manage the manner in which discovery proceeds"); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 891 (2d Cir. 1990) ("Where discovery is warranted, the court should exercise its inherent power

to limit and expedite it."); *United Parcel Serv. of Am., Inc. v. The Net, Inc.*, 222 F.R.D. 69, 71 (E.D.N.Y. 2004) ("'[T]he revisions in Rule 26(b)(2) are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery . . . .'") (citing Advisory Committee Notes to 1993 Amendment to Rule 26(b)(2)).

In deciding Plaintiffs' request for expedited discovery, the Court applies the "flexible standard of reasonableness and good cause" set out in *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326–27 (S.D.N.Y. 2005), which is regularly employed in this district and elsewhere.[1]  *See, e.g.*, *KeyBank, Nat'l Assoc. v. Quality Payroll Sys., Inc.*, 2006 WL 1720461, at *4 (E.D.N.Y. June 22, 2006); *New York v. Mountain Tobacco Co.*, 2013 WL 3488262, at *3 (E.D.N.Y. July 11, 2013) (rejecting *Notaro* and applying the "reasonableness" test); *Digital Sin, Inc. v. Does 1–176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012) (applying standard of "reasonableness and good cause" in determining expedited discovery request).  However, even under this more flexible standard, the Court does not find that Plaintiffs have shown sufficient cause to justify expedited discovery or that Plaintiffs' proposed discovery schedule is reasonable, given the breadth of Plaintiffs' document requests and the likelihood of disputes over assertions of privilege by Defendants.  (*See* Dkt. 23 at 16–21.)

In support of their request for expedited discovery, Plaintiffs claim that the alleged harms they have suffered, and continue to suffer, as a result of Defendants' conduct have "grown significantly more acute" since the filing of Defendants' September 10th letter requesting bifurcated discovery ("September 10th Letter").  (Dkt. 20-3 at 14–15.)  In that letter, Defendants

---

[1] Defendants urge this Court to adopt the framework set forth in *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982).  (Dkt. 23 at 21.)  The Court declines to do so because employing a preliminary-injunction analysis to determine entitlement to expedited discovery makes little sense, since it requires a showing of "some probability of success on the merits" before the moving party has obtained any discovery.  *See, e.g.*, *Ayyash*, 233 F.R.D. at 326.

set forth some of the facts that allegedly prompted the NYPD's surveillance and investigation of Plaintiffs.  (Dkt. 11.)  Plaintiffs assert that as a consequence of Defendants' September 10th Letter, Plaintiffs' fear of discriminatory surveillance has "grown substantially, as has the stigmatizing effect of this surveillance on Plaintiffs within their communities."  (Dkt. 20-3 at 15.)

Plaintiffs' claims of heightened fear and stigmatization, which are largely unsupported, do not demonstrate good cause warranting expedited discovery.  Indeed, the allegations in Plaintiffs' complaint, as well as the documents they submitted in connection with their discovery requests, plainly demonstrate that Plaintiffs were well aware of the scope of the NYPD's investigative activities relating to them, and more generally to the Muslim community in New York City, prior to Defendants' September 10th Letter and even before the filing of this lawsuit. (Dkt. 1 at 5–29; Dkt. 20-5.)  Accordingly, the discovery granted herein will not be conducted pursuant to Plaintiffs' proposed timeline, but according to the schedule set forth at the conclusion of this Memorandum and Order, with modifications as may be determined appropriate by Judge Azrack.[2]

II.  Plaintiffs' Document Requests

The Court evaluates Plaintiffs' document requests under the reasonableness standard set forth above and is guided by the Federal Rules of Civil Procedure, particularly Rule 26.  Rule 26 provides that the court:

> On motion or on its own . . . *must* limit the frequency or extent of discovery
> otherwise allowed by these rules or by local rule if it determines that the burden
> or expense of the proposed discovery outweighs its likely benefit, considering the

---

[2] The Court construes the parties' submissions with respect to Plaintiffs' discovery motion and their appearances before this Court and Judge Azrack as complying with Federal Rule of Civil Procedure 26(f), which requires, in relevant part, that parties meet and confer regarding a discovery schedule and other relevant discovery issues.  Based on the parties' competing positions, the Court concludes that further meet-and-confers would not be productive, and that the Court should set the discovery schedule for Plaintiffs' preliminary injunction motion.

> needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Rule 26(b)(2)(C)(iii) (emphasis added); *see, e.g.*, *In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 69 (noting that Rule 26(b)(2) permits a district court to limit discovery); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) ("Rule 26(b)(2) imposes general limitations on the scope of discovery in the form of a 'proportionality test[.]'"); *Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 91 (D. Conn. 2012) ("Under Rule 26(b)(2)(C), courts impose a proportionality test to weigh the interests of the parties to determine whether discovery, even if relevant, should be allowed to proceed."); *Lineen v. Metcalf & Eddy, Inc.*, 1997 WL 73763, at *2 (S.D.N.Y. Feb. 21, 1997) ("In determining the limits of discovery, [courts] must balance the plaintiff's need for the requested data against the burden imposed on the defendant.") (collecting cases).

A.     <u>Request #1</u>

<div style="border:1px solid">

<u>Request #1</u>

Documents concerning Plaintiffs.

</div>

The documents requested by Plaintiffs in Request #1 clearly are relevant to their claims. In fact, Defendants have agreed to produce all documents and information in their possession regarding Plaintiffs.  (Dkt. 24-1 at 11–14) (Defendants intend to produce all information that they have about Plaintiffs in discovery); (Dkt. 23 at 1–2) ("defendants' pending proposal for bifurcated discovery would provide all information regarding any investigation or surveillance of these six plaintiffs, and the reasons for those actions"); (Dkt. 20-3 at 6) ("The parties appear to be in agreement that Plaintiffs are entitled to Intelligence Division documents concerning

Plaintiffs themselves, whatever those documents may be formally labeled in the NYPD's files.");
(Dkt. 11 at 2.)  The Court accordingly grants Request #1.

Plaintiffs raise two objections with respect to the scope of Defendants' responses to this request.  (Dkt. 20-3 at 6–7.)  First, Plaintiffs object to Defendants "narrowly defining what constitutes an 'investigation' or 'surveillance'" in deciding which documents are responsive to this request.  (Dkt. 20-3 at 6.)  The Court agrees.  Defendants must construe this request to include as responsive all documents they have about or referencing Plaintiffs, however those documents are labeled or classified.

Second, while Plaintiffs seek documents specifically pertaining to themselves, if those documents also contain information regarding other subjects, Plaintiffs request that such information be deemed responsive, and disclosed, as well.  (Dkt. 20-3 at 6–7.)  Plaintiffs argue that the information about other subjects referenced in these documents could, for example, "give[] rise to an inference that any investigation of Plaintiffs was part of a broader program of unwarranted surveillance of Muslims."  (Dkt. 20-3 at 6.)  The Court denies, in part, this aspect of Request #1.  The Court agrees that Plaintiffs' inclusion in documents referencing other Muslims who were investigated, possibly without reasonable suspicion or probable cause, could be probative of discriminatory intent.  Accordingly, while the Court will permit Defendants to redact the names of non-Plaintiff subjects, these redactions must be accompanied by an indication of: (1) whether the subject was a Muslim individual or organization; and (2) whether the subject was at any time investigated or surveilled by the NYPD.  However, even though identifying information may be redacted, information describing investigative and surveillance actions taken with respect to these non-Plaintiffs must be disclosed, unless the disclosure of this

information would indirectly reveal the subject's identity or threaten to undermine an ongoing investigation.

B.    Request #2

---

#### Request #2

Documents concerning the following Investigations:

     a. Preliminary Inquiry # 10/08;
     b. Terrorism Enterprise Investigation # 01/03;
     c. Terrorism Enterprise Investigation # 04/08.

---

To the extent documents sought by this request pertain to Plaintiffs, those documents are responsive and must be produced.  To the extent these documents do not pertain to Plaintiffs, they need not be produced, unless they are responsive to another permitted request.

C.    Request #3

---

#### Request #3

Organizational charts and Documents describing the Intelligence Division and its activities.

---

The Court construes Request #3 as seeking charts and information pertaining to the structure and organization of the NYPD Intelligence Division and a *general* description of its "activities," *i.e.*, areas of responsibility.  Such information is relevant and discoverable. However, to the extent Plaintiffs' request seeks production of documents regarding specific "activities" of the Intelligence Division, it is overly broad.  Accordingly, Request #3 is granted, as limited (see below) to a general description of the Intelligence Division's structure, organization, and activities:

    "Organizational charts and Documents describing the structure, organization, general operation, and purpose/mission of the Intelligence Division."

D.     Request #4

---

**Request #4**

Intelligence Division reports, assessments, presentations, memoranda, policy statements, operational directives, strategy documents, and training materials concerning any of the following as a basis for, or a factor relevant to, the decision to engage in Surveillance or Investigations:

      a. Islam, its adherents, or its schools of thought, including, but not limited to, Salafis or Salafism;

      b. Non-Islamic religions, their adherents, or their schools of thought;

      c. "Ancestries of interest" as identified in an Intelligence Division presentation, *available at* http://bit.ly/1alTs2A.

---

Plaintiffs' Request #4 goes to the heart of their claims. Yet, as currently written, the request is overbroad and has the potential to reveal countless documents that are of limited probative value or relevance and may also be covered by the law enforcement privilege. Accordingly, the Court grants Request #4 as modified below. *See infra* at 21.

1.     Relevance

In order to prove their Equal Protection and First Amendment claims, Plaintiffs must show that Defendants have acted with a discriminatory purpose or intent with respect to their investigation and surveillance of Plaintiffs. *See*, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (with respect to claims of "invidious discrimination in contravention of the First and Fifth Amendments . . . the plaintiff must plead and prove that the defendant acted with discriminatory purpose"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977) (requiring plaintiff to prove that "discriminatory purpose was a motivating factor in the

[municipality's] decision").  Indeed, on this issue, the parties appear to be in agreement.  (Dkt. 20-3 at 3; Dkt. 23 at 4–6; Dkt. 27 at 7–8.)[3]

Plaintiffs can make this showing in several ways: "A plaintiff could point to a law or policy that 'expressly classifies person on the basis of race.'  Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner.  A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."  *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) (itself quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227–29 (1995)) (other internal citations omitted).

Plaintiffs indicate that they may seek to prove discriminatory intent in one or two of the ways identified in *Brown*: (1) an express classification theory—by showing that "the NYPD expressly classified Muslims by adopting a policy of singling them out for heightened policy scrutiny"; or (2) a discriminatory application theory—"to the extent that Defendants claim they had a legitimate law enforcement interest in Plaintiffs, . . . by showing that [Plaintiffs] were subject to NYPD investigations of unequal and unwarranted scope, duration, and invasiveness as a result of their religious beliefs and activities."  (Dkt. 20-3 at 3); *Brown*, 221 F.3d at 337 ("A plaintiff could point to a law or policy that expressly classifies persons on the basis of race . . . .  Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner.").  Plaintiffs maintain that documents reflecting a policy or

---

[3]  Although the parties spend little time in their submissions addressing Plaintiffs' First Amendment claims, Plaintiffs assert that the same arguments supporting the relevance of discriminatory motive evidence with respect to the Fourteenth Amendment apply to their First Amendment claims.  (Dkt. 20-3 at 3 n.1)  Defendants do not indicate any disagreement with this contention in their submission.

11

program by Defendants to investigate and surveill Muslims *as a group* are not only directly relevant, but necessary, to making either of these showings.  (Dkt. 20-3 at 3–4; Dkt. 27 at 6–7.)

As Plaintiffs note, Defendants effectively concede the relevance of the NYPD's strategy and policy documents.  (Dkt. 27 at 6; Dkt. 23 at 6–7 n.6) (acknowledging that NYPD strategy and policy documents "may be relevant to a *Monell* claim").  However, Defendants argue that, notwithstanding the potential relevance of policy documents to Plaintiffs' *Monell* claims, Plaintiffs are not entitled to such documents at this time because Plaintiffs "must first establish an underlying constitutional violation, in other words, they must establish that the NYPD had an improper motive in surveilling them."  (Dkt. 23 at 6–7 n.6.)  This is incorrect.

In contrast to a claim under the Fourth Amendment, the existence of criminal predication, *e.g.*, reasonable suspicion or probable cause, does not automatically defeat an Equal Protection claim.[4]  An Equal Protection claim can be established where there exist "mixed motives" for the challenged government conduct.  *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985); *Vill. of Arlington Heights*, 429 U.S. at 270; *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Even if Defendants' investigations of Plaintiffs were supported by criminal predication, if those investigations were improperly influenced by Plaintiffs' religion, they may be unconstitutional.  *See Whren v. United States*, 517 U.S. 806, 813 (1996) (distinguishing between Section 1983 actions based on the Fourth Amendment, where the defendants' "[s]ubjective intentions play no role," and actions based on the Equal Protection Clause, which are based on "intentionally discriminatory application" of the law, and further noting that "the constitutional basis for objecting to intentionally discriminatory application of

---

[4] Although Plaintiffs assert that the same reasoning applies to their First Amendment claims, the parties did not address that issue in their submissions, and the Court need not resolve it, given that Plaintiffs' Equal Protection claim is sufficient to justify discovery of the policy documents that Plaintiffs seek.

laws is the Equal Protection Clause, not the Fourth Amendment"); *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) ("The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."); *United States v. Scopo*, 19 F.3d 777, 786 (2d Cir. 1994) (Newman, C.J., concurring) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations.").

In such "mixed motive" or "dual motivation" cases, the existence of permissible motives does not preclude a finding that an impermissible discriminatory purpose was a factor in the government's actions. *See Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287 (existence of non-discriminatory reasons for the plaintiff's firing did not preclude an Equal Protection claim, where the plaintiff alleged that the exercise of his right to free speech was a substantial or motivating factor in the defendant school board's decision to fire him); *United States v. City of Yonkers*, 96 F.3d 600, 611–12 (2d Cir. 1996) (discriminatory intent need not be the sole reason for the government's action); *Howard v. Senkowski*, 986 F.2d 24, 29–30 (2d Cir. 1993) ("challenged action is invalid if motivated *in part* by an impermissible reason") (emphasis added); *Vill. of Arlington Heights*, 429 U.S. at 270 ("[*Washington v. Davis*, 426 U.S. 229 (1976)] does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes.") (emphasis added).

Plaintiffs, however, must prove, by a preponderance of the evidence, that the alleged "discrimination was a substantial or motivating factor" for the government's action or decision. *See Hunter*, 471 U.S. at 225; *see also City of Yonkers*, 96 F.3d at 611–12 (a plaintiff making an Equal Protection claim must show that an impermissible factor, such as race, was "*a motivating*

factor" for the state's action) (quoting *Vill. of Arlington Heights*, 429 U.S. at 266) (emphasis in original); *Vill. of Arlington Heights*, 429 U.S. at 265 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").  Plaintiffs, though, "need not show . . . that a government decisionmaker was motivated solely, primarily, or even predominantly by" improper concerns based on religion.  *See City of Yonkers*, 96 F.3d at 611–12 (involving racially motivated government action).

The Court recognizes that, other than in the selective prosecution model, the application of the "dual motivation" framework to allegedly discriminatory *law enforcement* activities is not well-established.[5]  However, the Second Circuit's decision in *Pyke v. Cuomo* supports the proposition that a plaintiff can bring an Equal Protection claim with respect to law enforcement conduct *without* alleging selective prosecution.[6]  In *Pyke*, residents of the Mohawk Indian reservation in upstate New York sued State officials for discriminatorily withholding police protection on the reservation.  *Pyke v. Cuomo*, 258 F.3d 107, 108 (2d Cir. 2001).  The district court granted summary judgment to the State on the grounds that the plaintiffs had failed to demonstrate disparate treatment and also had failed to plead express racial classification.  *Id.* The Second Circuit vacated and remanded.  *Id.* at 110.

---

[5] The majority of cases cited in the prior Equal Protection discussion arose in the context of non-law enforcement governmental activities.

[6] In selective prosecution cases, a plaintiff must allege and prove that similarly situated individuals outside of his protected class were treated differently ("Armstrong Rule").  *Pyke*, 258 F.3d at 109 ("[I]f a plaintiff seeks to prove selective prosecution on the basis of race, 'he must show that similarly situated individuals of a different race were not prosecuted'" (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)); *see also id.* at 110.  As the *Pyke* court noted, however, the Armstrong Rule applies exclusively in selective prosecution cases.  *Id.* at 109 ("In the present case, however, plaintiffs do not make a claim of selective prosecution.  The Armstrong rule has no application to their claim.").

The panel specifically held that:  "A plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals."  *Id.* at 108–09.  The panel distinguished between Equal Protection claims alleging selective prosecution, for which disparate treatment of similarly situated individuals must be demonstrated, and claims "challenging a law or policy that contains an express, racial classification" for which "it is not necessary to allege the existence of a similarly situated non-minority group."  *Id*. at 109 (quoting *Brown*, 221 F.3d at 337).  The panel's decision was based, in part, on the reality that it can be difficult to make direct comparisons between different groups to demonstrate animus.  *Id.*  ("It would be difficult, if not impossible, to find other individuals whose situation is similar to [Plaintiffs' situation as] Native Americans living on a reservation and exercising a substantial measure of self-government independent of New York State.").

The panel also made clear that the Circuit's holding in *Brown*, establishing that no showing of disparate treatment is necessary for an Equal Protection claim, is not limited to challenges to policies containing express racial classifications:

> We now clarify—a plaintiff who, as in *Brown,* alleges an express racial classification, *or* alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, *or* that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.

*Id*. at 110 (emphases added).  Therefore, Plaintiffs may proceed with an Equal Protection claim based on Defendants' allegedly discriminatory investigation and surveillance of Plaintiffs without alleging selective prosecution and without alleging or proving disparate treatment of a similarly situated non-Muslim group.

15

Accordingly, because evidence of Defendants' intent with respect to their investigative activities of Plaintiffs is central to Plaintiffs' Equal Protection claims, the Court concludes that Plaintiffs are entitled to discovery regarding any NYPD policy or program involving the investigation of Muslims as a group based, in whole or part, on their religion.  Without this discovery, Plaintiffs would be preemptively and irreparably prohibited from proving that Defendants' alleged discriminatory intent was a motivating factor in the investigation and surveillance of Plaintiffs.  Contrary to Defendants' contention, this is more than a mere "fishing expedition."  (Dkt. 23 at 8.)  Indeed, documents attached to Plaintiffs' submissions strongly suggest that Defendants have documents responsive to this request.  (*See*, *e.g.*, Dkt. 20-5.)  At least two of the documents provided by Plaintiffs reference Plaintiff At Taqwa mosque.  (Dkt. 20-5 at ECF 55, 112).  Numerous other documents ambiguously reference "Taqwa."  (Dkt. 20-5 at ECF 84, 86, 90, 111, 114, 183.)[7]  Yet another document references Plaintiff Elshinawy.  (Dkt. 20-5 at ECF 173.)

Defendants also argue that information about the NYPD's investigations of non-Plaintiff Muslims and non-Muslims, which could include the strategic or policy documents sought by Request #4, is irrelevant because "the only information apt to prove or disprove discriminatory purpose" are documents pertaining to the investigations of Plaintiffs.  (Dkt. 23 at 5–6.)  In essence, Defendants' argument is that no documents beyond those that specifically reference Plaintiffs or that Defendants identify as containing information that was factored into Plaintiffs' investigations can be relevant to establishing a discriminatory intent or purpose to investigate Muslims as a group, including Plaintiffs.  This argument falls short for several reasons.

---

[7] The Court assumes that references to "*Al* Taqwa" in the document are, in fact, to Plaintiff *At* Taqwa mosque.  (*See, e.g.*, Dkt. 20-5 at ECF 66, 69, 88, 114, 135, 143, 174.)  Citations to "ECF" reference the pagination of the Electronic Court Filing system, and not the document's internal pagination.

First, Defendants presume the outcome of the requested discovery in asserting that documents responsive to this request, *i.e.*, policy or strategy documents, could never be relevant to a showing of discriminatory intent with respect to Defendants' investigations of Plaintiffs. Defendants contend that their records will reveal criminal predication for their investigations, thereby precluding a finding of discriminatory intent.  If the Court were to limit discovery in this way, Plaintiffs would not "ha[ve] the opportunity to take discovery on the existence of discriminatory motivation," and would be constrained to the limited evidence pertaining directly to them.  *Pyke*, 258 F.3d at 110.

Second, and relatedly, Defendants too narrowly define the purpose of discovery.  While it may turn out that Plaintiffs are unable to demonstrate that their investigations were prompted or affected in any way by an alleged "Muslim surveillance program," the purpose of discovery is to enable a party to obtain potentially relevant information with which to make this determination and argue its position.  Limiting the scope of discovery is especially inappropriate when, as here, the central fact at issue, discriminatory intent, is difficult to establish.  *See Hunter*, 471 U.S. at 228 ("Proving the motivation behind official action is often a problematic undertaking."); *Vill. of Arlington Heights*, 429 U.S. at 266 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Gray v. Bd. of Higher Educ., City of New York*, 692 F.2d 901, 906 (2d Cir. 1982) (reversing district court's denial of discovery in part because "[t]he district court minimized the importance of appellants' discovery needs in connection with" intent evidence and finding that "if unable to engage in discovery, [the plaintiff] cannot prove intent, and without

proof of intent, he has no case").[8]   Despite these principles encouraging broad discovery, here the Court has limited discovery only to those documents *necessary* for Plaintiffs to prove their case because of the sensitive nature of the requested discovery.   Nevertheless, the Court cannot go so far as to prevent Plaintiffs from taking otherwise proper discovery in a way that would unfairly limit their ability to prove their claims.

Third, as discussed *supra*, given that Plaintiffs must demonstrate that the NYPD's investigations of them were motivated, at least in part, by a discriminatory purpose, and that a showing of criminal predication for the investigations does not end the inquiry, Plaintiffs should be permitted to obtain at this stage all potentially relevant information on the existence of a policy or program that either expressly classifies Plaintiffs based on their religion or is applied to them in a discriminatory fashion.   If Plaintiffs are precluded from obtaining any information about whether there exists an overarching policy or program to investigate or surveill Muslims as a group, they will be unfairly hampered in arguing that religion was a substantial or motivating factor in Defendants' decisions relating to the initiation, continuation, scope, and methodology of the investigations of Plaintiffs.   *See, e.g.*, *Brown*, 221 F.3d at 337 (affirming dismissal of equal protection claims where plaintiffs could not identify "any law or policy that contain[ed] an "express racial classification").

---

[8]   Absent a "smoking gun," which is especially rare in discrimination cases, plaintiffs in these cases frequently must rely on circumstantial evidence to demonstrate defendants' discriminatory intent.   *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (noting that in employment discrimination cases, "[b]ecause an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence"); *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent.   A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.") (citations omitted).

The Court has carefully considered the bifurcated discovery proposed by Defendants, and declines to adopt that approach for one principal reason. Even if, following the first phase of bifurcated discovery, the NYPD presents information establishing that it had reasonable suspicion and/or probable cause for the investigations of Plaintiffs and there also was *no* information in Defendants' records of Plaintiffs suggesting that a broader policy to investigate Muslims as a group was applied to these Plaintiffs, the Court would still be compelled to find that Plaintiffs are entitled to discovery as to whether such a broad-based policy exists, and whether it applied or applies to Plaintiffs. Defendants do not make any satisfactory argument against this point. (Dkt. 23 at 4–10.) For example, Defendants cite to no Equal Protection case in which a court dismissed the plaintiff's complaint based solely on a finding of probable cause. As discussed, information about an overarching policy, if one exists, could still be used by Plaintiffs to argue that, notwithstanding the existence of criminal predication as to Plaintiffs, a substantial or motivating factor behind Defendants' initiation of its investigations of Plaintiffs, and/or the length, scope, or intrusiveness of those investigations, was a broader discriminatory policy to investigate Muslims. Therefore, there is no reason to delay discovery that Plaintiffs would be permitted to obtain regardless of the results of the first phase of bifurcated discovery.[9]

---

[9] Defendants rely heavily on the Second Circuit's decision in *Dinler v. City of New York*, 607 F.3d 923 (2d Cir. 2010) ("*In re City of New York*"). In *Dinler*, the Second Circuit panel issued a writ of mandamus overturning an order of the district court compelling the NYPD to produce intelligence reports prepared by undercover officers regarding potential security threats surrounding the Republican National Convention. However, *Dinler* is distinguishable from this case. In *Dinler*, the undercover reports that the defendants were ordered to produce were largely irrelevant to the plaintiffs' case since the plaintiffs were challenging only their own arrests and not the undercover operations. *Id.* at 931 n.6. Here, by contrast, the documents sought through Request #4 are directly relevant to the discriminatory intent element of Plaintiffs' Equal Protection claims. The *Dinler* decision focused on the plaintiffs' Fourth Amendment Claims, and therefore the defendants' motive was irrelevant, unlike here. *See id.* at 931 (plaintiffs claim, *inter alia*, "that NYPD officers had arrested them without cause, subjected them to unreasonably long periods of detention, and fingerprinted them without authorization"). Moreover, the district

In reaching this decision, the Court is mindful that, even if such a discriminatory policy exists, Plaintiffs will have to demonstrate causation, *i.e.*, that Defendants' investigations of Plaintiffs were motivated, at least in part, by that policy. *See McCleskey v. Kemp*, 481 U.S. 279, 292, 294–96 (1987) ("to prevail under the Equal Protection Clause, [plaintiff] must prove that the decisionmakers in *his* case acted with discriminatory purpose") (emphasis in original). The Court also is aware that the existence of criminal predication with respect to those investigations is highly relevant to that determination. *Cf. Hartman v. Moore*, 547 U.S. 250. 260–61 (2006) (existence of probable cause is highly relevant to determination of but-for causation with respect to the allegedly retaliatory prosecution). However, the existence of criminal predication with respect to Plaintiffs' investigations does not, in itself and as a matter of law, negate the possibility of causation between the allegedly discriminatory policy and Plaintiffs' investigations. Furthermore, this determination is one that must be made at the conclusion, not the initiation, of discovery, and Plaintiffs should be permitted to obtain discovery that may be relevant to that determination.

Discriminatory intent is at the core of Plaintiffs' claims—and the existence of a formal policy or practice, if one exists, certainly would be relevant to Plaintiffs' claims. Plaintiffs are entitled to seek evidence that would tend to show Defendants' discriminatory intent in investigating them. Federal Rule of Civil Procedure 26(b)(1) provides for broad discovery into evidence "regarding any nonprivileged matter that is relevant to a party's claim or defense" and

---

court in *Dinler* ordered production of documents over which the city had claimed law enforcement privilege. *Id.* at 931. The Second Circuit issued a writ of mandamus in *Dinler* at least in part on that basis—because the court ordered production of documents subject to the law enforcement privilege, mandamus was the only adequate means for the city to obtain the relief it sought. *Id.* at 934–35. The Court's order today does not impinge upon Defendants' ability to claim law enforcement privilege with respect to particular documents, which can be addressed on a document-specific basis. *See infra* at 27.

that "the court may order discovery of *any matter relevant* to the subject matter involved in the action."  Here, if Defendants have a policy, whether formally adopted or adhered to in pattern or practice, its existence would make it more likely that Plaintiffs themselves were investigated on the basis of their religion, potentially in violation of their constitutional rights.  Accordingly, artificially limiting discovery in the manner suggested by Defendants, to wit, *exclusively* to documents referring to Plaintiffs, would be inadequate under these circumstances.

As it must, the Court considers the potential burden and expense of Defendants' compliance with Request #4.  *See* Fed. R. Civ. Proc. 26(b)(2)(C)(iii).  As currently framed, the request is overly broad, in that it could be interpreted as requiring the production of documents other than strategic or policy documents, *e.g.*, case-specific "reports or assessments."  In order to tailor the request to specific information necessary to Plaintiffs' claims and to minimize the potential burden on Defendants, the Court narrows the request as follows:

Request #4

*Intelligence Division documents containing operational directives, presentations, memoranda, strategy initiatives, training procedures, and policies,* concerning any of the following as a basis for, or a factor considered in, deciding to engage in Surveillance or Investigations:

a. Islam, its adherents, or its schools of thought, including but not limited to Salafis or Salafism;

b. Non-Islamic religions, their adherents, or their schools of thought *with any alleged link or connection to terrorism*;

c. "Ancestries of interest" as identified as an Intelligence Division presentation, available at http://bit.ly/1aITs2A

Accordingly, Plaintiffs' Request #4, as modified, is granted.

E.      Requests #5 and #6

| Request #5 |
| --- |
| Documents, from 2004 through the present, concerning Surveillance of:<br>        a. Muslim individuals and organizations;<br>        b. Non-Muslim individuals' religious speech, beliefs, practices, or activities;<br>        c. Non-Muslim religious organizations' religious speech, beliefs, practices, or activities. |
| Request #6 |
| Documents, from 2004 through the present, concerning Investigations of:<br>        a. Muslim individuals and organizations;<br>        b. Non-Muslim individuals' religious speech, beliefs, practices, or activities;<br>        c. Non-Muslim religious organizations' religious speech, beliefs, practices, or activities. |

Requests #5 and #6 seek all records from 2004 through the present concerning investigations and surveillance of all Muslims, without limitation, and all non-Muslims on the basis of their religious beliefs or practices. These requests are, at best, of limited probative value or relevance and, at the same time, impossibly burdensome. *See Lineen*, 1997 WL 73763, at *2; *Tucker*, 281 F.R.D. at 91. The Court, therefore, denies these requests in their entirety.

Plaintiffs seek these documents in order to permit a comparison between Defendants' investigations of Muslims and non-Muslims on the basis of their religious speech or practices. (Dkt. 20-3 at 13–14.) This information, Plaintiffs argue, would permit them to demonstrate unconstitutional disparate treatment between Muslims and non-Muslims. Plaintiffs then would seek to compare the frequency and intensity of investigations of Muslims with the "comparator" groups of other religious individuals and organizations in order to show that Defendants have disproportionately targeted Muslims *because of* their religion.

Defendants counter that this "comparator" evidence sought by Plaintiffs does not exist because there is no appropriate "comparator." (Dkt. 23 at 11–12; Dkt. 25 ¶¶ 14–15.) Indeed, a disparate treatment analysis requires a comparison between the plaintiffs and those *similarly situated* to the plaintiffs who are outside the plaintiffs' protected class. *See Brown*, 221 F.3d at 337 ("it is sometimes necessary to allege the existence of a similarly situated group that was treated differently"); *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("The Equal Protection Clause requires that the government treat all similarly situated people alike.") (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).[10]

The Court agrees with Defendants that there is no meaningful way to compare all Muslims who were investigated by Defendants, including Plaintiffs, to all non-Muslim individuals and organizations investigated by Defendants on the basis of their religious beliefs or practices.[11] Given the myriad of factors that go into every investigation and, indeed, every step of every investigation, attempting to compare hundreds, if not thousands, of different investigations to each other to discern a pattern of disparate treatment of similarly situated individuals would be futile. Furthermore, as Plaintiffs acknowledge, they need not allege or prove a similarly situated group that was treated differently than Muslims and/or Plaintiffs in order to prove their claims. (Dkt. 27 at 4 n.4.) *See Pyke*, 258 F.3d at 110 ("a plaintiff who . . . alleges an express racial classification, or alleges that a facially neutral law or policy has been

---

[10] Notably, Plaintiffs are not alleging selective enforcement, which, as previously discussed, would require a comparison between Plaintiffs and similarly situated individuals and organizations outside the protected class. (Dkt. 27 at 4 n.4); *see Pyke*, 258 F.3d at 109 ("a plaintiff alleging a claim of selective prosecution in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted").

[11] The Court, however, does not endorse Defendants' reasoning as to *why* there is no adequate comparator group to Plaintiffs. (*See, e.g.*, Dkt. 23 at 11–12; Dkt. 25 ¶¶ 14–15.)

applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection").

The limited probative value of Requests #5 and #6 is balanced against the fact that they are impossibly burdensome.[12]  As Defendants explained, "[b]ecause the Intelligence Bureau does not categorize or maintain files or documents based upon religion, compliance with plaintiffs' request would require a document by document review to determine if a document related to religious speech, beliefs, practices or activities of a non-Muslim individual or organization." (Dkt. 23 at 16.)  Although Requests #5 and #6 purport to be limited (Dkt. 27-3 at 13–15), the practical effect would be to require Defendants to review and analyze virtually all of its records over a nine-year period to determine whether they should be produced.  (Dkt. 23 at 15–16) (Defendants explaining burden imposed by Requests #5 and #6: "it stands to reason that most of the Intelligence Bureau's counter-terrorism investigations since September 11th have involved subjects who are Muslim" and that "plaintiffs' requests call for the vast majority of Intelligence Bureau documents pertaining to all of its activities, not just its counter-terrorism efforts").

In sum, balancing the minimal probative value and relevance of the requested documents against the unreasonable burden and expense, as well as the diversion of important government resources, that would be caused by compliance, Requests #5 and #6 are denied in their entirety.

---

[12] Despite Plaintiffs' claims that they sought to streamline their document requests to minimize burden to Defendants it is clear that the volume of documents that would be produced pursuant to Requests #5 and #6 would be tremendous.

F.    Requests #7 – #9

<table>
<tr><td>

<u>Request #7</u>

Documents, from 2004 through the present, containing statistics concerning the number of Investigations of:
    a. Muslim individuals;
    b. Muslim organizations;
    c. Non-Muslim individuals either investigated on the basis of religious affiliation, speech, belief or activities, or investigated when one or more of religious affiliation, speech, belief or activities were factors relevant to the decision to investigate;
    d. Non-Muslim religious organizations.

</td></tr>
<tr><td>

<u>Request #8</u>

Documents, from 2004 through the present, containing statistics concerning the number of individuals and organizations under Surveillance that are:
    a. Affiliated with Islam;
    b. Affiliated with a religion other than Islam;
    c. Not affiliated with any religion.

</td></tr>
<tr><td>

<u>Request #9</u>

Documents, from 2004 through the present, containing statistics concerning criminal charges resulting from the activities of the Intelligence Division, including statistics broken down by each sub-unit and category below, brought against:
    a. Muslim individuals;
    b. Muslim organizations;
    c. Non-Muslim individuals either investigated on the basis of religious affiliation, speech, belief or activities, or investigated when one or more of religious affiliation, speech, belief or activities were factors relevant to the decision to investigate;
    d. Non-Muslim religious organizations.

</td></tr>
</table>

Requests #7 through #9 pose similar problems as Requests #5 and #6.  First, Defendants

state that they do not possess the requested statistics because they do not maintain records of

their investigations according to the subjects' religion.  (Dkt. 23 at 15–16.)  Defendants cannot

be compelled to produce documents or information that they do not possess.  *See* Fed. R. Civ.

Proc. 34(a)(1) (providing that "[a] party may serve on any other party a request . . . to produce

[documents] in the responding party's possession, custody, or control"); *Shcherbakovskiy v. Da

Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) ("a party is not obliged to produce, at the

25

risk of sanctions, documents that it does not possess or cannot obtain"). Nor are Defendants required to compile the requested statistics, even assuming *arguendo* that it could be done. *See Shcherbakovskiy*, 490 F.3d at 138 (a party is not required to produce documents not in its possession, custody or control); (Dkt. 23 at 16) ("plaintiffs' proposed document requests seek statistics that do not exist" and Defendants would have to review "virtually every document maintained by the Intelligence Bureau over a nine year period").

Furthermore, as with the documents responsive to Requests #5 and #6, the documents sought by Requests #7, #8, and #9, even if they existed, would be of limited probative value and relevance. Statistics concerning the number of Intelligence Bureau investigations, instances of surveillance, and criminal charges of Muslims and non-Muslims are not readily susceptible to the conclusion Plaintiffs seek to draw from them, or any conclusion for that matter, given, as previously discussed (*supra* at 23) the countless factors and variables behind any investigation.

Accordingly, given the impossibility of compliance, as well as the minimal probative value and relevance of the requested documents and information, Requests #7, #8, and #9 are denied.

G.  <u>Interrogatory</u>

<u>Interrogatory #1</u>

Does the Intelligence Division have, in its possession, custody, or control, a database or means of electronic analysis concerning the following information? If so, please describe the types of records and search functions available for each sub-category below:

a. From 2004 through the present, statistics concerning the number of Investigations of: Muslim individuals; Muslim organizations; non-Muslim individuals either investigated on the basis of religious affiliation, speech, belief or activities, or investigated when one or more of religious affiliation, speech, belief or activities were factors relevant to the decision to investigate; and non-Muslim religious organizations.

b. From 2004 through the present, statistics concerning the number of individuals and organizations under Surveillance that are: affiliated with Islam; affiliated with a religion other

than Islam; and, not affiliated with any religion.

c. From 2004 through the present, statistics concerning criminal charges resulting from the activities of the Intelligence Division, including statistics broken down by each sub-unit, brought against: Muslim individuals; Muslim organizations; non-Muslim individuals either investigated on the basis of religious affiliation, speech, belief or activities, or investigated when one or more of religious affiliation, speech, belief or activities were factors relevant to the decision to investigate; and non-Muslim religious organizations.

Rather than oppose the interrogatory on legal grounds, Defendants state that the interrogatory's topic, namely, a database containing statistics of investigations of Muslims and non-Muslims based on their religion, does not exist.  (Dkt. 23 at 15–16.)  The Court, therefore, grants Plaintiffs' interrogatory, and Defendants may respond accordingly.

III.   <u>Privilege</u>

Among their objections to Plaintiffs' discovery requests, Defendants assert that "disclosure of extremely sensitive and confidential investigations that do not directly relate to plaintiffs would jeopardize on-going and contemplated investigations, and the disclosure of such documents would harm the privacy interests of individuals who have been investigated, but not charged."  (Dkt. 23 at 3.)  Defendants also assert that "such disclosure will endanger the safety and undermine the efficacy of undercover police officers and confidential sources who work with the Intelligence Bureau."  (Dkt. 23 at 3.)

The Court is mindful of the importance of protecting privileged information, especially relating to law enforcement investigations, operations, and techniques.  *See Dorsett v. Cnty. of Nassau*, 762 F. Supp. 2d 500, 520 (E.D.N.Y. 2011) (identifying types of information that are covered by the law enforcement privilege and holding that where the privilege is found to apply, there is a "strong presumption" against lifting it and ordering the production of documents) (citing *In re The City of New York*, 607 F.3d at 944).  Nothing in this order in any way limits Defendants' ability to claim law enforcement or any other privilege with respect to responsive

27

documents or portions thereof.  Such assertions of privilege, if any, should be presented to Judge Azrack, who will preside over the discovery process.

*CONCLUSION*

Plaintiffs' motion for expedited discovery in support of its contemplated motion for a preliminary injunction is granted in part, and denied in part, to the extent set forth herein.  The parties shall proceed with discovery and briefing of the preliminary injunction motion according to the schedule set forth below.  Given the likelihood that Defendants will need additional time to compile and review documents responsive to Request #4, the schedule provides for two stages of discovery, the first requiring the production of documents and information responsive to Requests #1 – #3 and the sole Interrogatory, and second requiring the production of documents responsive to Request #4.

<u>Discovery and Briefing Schedule</u>

- 2 weeks from order – Parties serve their document requests and interrogatories.

- 1 month thereafter – Defendants respond to Document Requests #1 – #3 and the Interrogatory; and Plaintiffs respond to Defendants' discovery requests, if any.

- 1 month thereafter – Defendants respond to Plaintiffs' Document Request #4.

- 3 weeks thereafter – Parties serve deposition notices.

- 2 months thereafter – Depositions completed.

- 2 weeks thereafter – Parties serve requests for admission.

- 3 weeks thereafter – Parties respond to requests for admission.

- 4 weeks thereafter – Plaintiffs serve their motion for preliminary injunction on Defendants.

- 4 weeks thereafter – Defendants serve their response to the preliminary injunction motion on Plaintiffs.

- 3 weeks thereafter – Plaintiffs serve their reply regarding the preliminary injunction motion on Defendants.  Parties file their preliminary injunction submissions with the Court.


SO ORDERED:


   /s Pamela K. Chen      
PAMELA K. CHEN
United States District Judge

Dated: November 22, 2013
        Brooklyn, New York